REVES ET AL. *v.* ERNST & YOUNG

No. 91–886.   Argued October 13, 1992—Decided March 3, 1993

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, and KENNEDY, JJ., joined, and in all but Part IV–A of which SCALIA and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 186.

*Gary M. Elden* argued the cause for petitioners. With him on the briefs were *John R. McCambridge, Jay R. Hoffman,* and *Robert R. Cloar.*

*Michael R. Dreeben* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller,* and *Deputy Solicitor General Bryson.*

*Kathryn A. Oberly* argued the cause for respondent. With her on the brief were *Bruce M. Cormier, John Matson, Carl D. Liggio,* and *Fred Lovitch.**

---

*Briefs of *amici curiae* urging reversal were filed for the National Association of Insurance Commissioners by *Ellen G. Robinson* and *C. Philip Curley;* for the National Association of Securities and Commercial Law

JUSTICE BLACKMUN delivered the opinion of the Court.[1]

This case requires us once again to interpret the provisions of the Racketeer Influenced and Corrupt Organizations (RICO) chapter of the Organized Crime Control Act of 1970, Pub. L. 91–452, Title IX, 84 Stat. 941, as amended, 18 U. S. C. §§ 1961–1968 (1988 ed. and Supp. II). Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." The question presented is whether one must participate in the operation or management of the enterprise itself to be subject to liability under this provision.

I

The Farmer's Cooperative of Arkansas and Oklahoma, Inc. (Co-Op), began operating in western Arkansas and eastern Oklahoma in 1946. To raise money for operating expenses, the Co-Op sold promissory notes payable to the holder on demand. Each year, Co-Op members were elected to serve on its board. The board met monthly but delegated actual management of the Co-Op to a general manager. In 1952, the board appointed Jack White as general manager.

In January 1980, White began taking loans from the Co-Op to finance the construction of a gasohol plant by his company,

Attorneys by *Kevin P. Roddy* and *William S. Lerach;* and for Trial Lawyers for Public Justice, P. C., by *G. Robert Blakey* and *Arthur H. Bryant.*

*Laurence Gold, Robert Weinberg, Martin S. Lederman, Jed S. Rakoff,* and *Michael L. Waldman* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

*Louis A. Craco* filed a brief for the American Institute of Certified Public Accountants as *amicus curiae.*

[1] JUSTICE SCALIA and JUSTICE THOMAS do not join Part IV–A of this opinion.

White Flame Fuels, Inc. By the end of 1980, White's debts to the Co-Op totaled approximately $4 million. In September of that year, White and Gene Kuykendall, who served as the accountant for both the Co-Op and White Flame, were indicted for federal tax fraud. At a board meeting on November 12, 1980, White proposed that the Co-Op purchase White Flame. The board agreed. One month later, however, the Co-Op filed a declaratory action against White and White Flame in Arkansas state court alleging that White actually had sold White Flame to the Co-Op in February 1980. The complaint was drafted by White's attorneys and led to a consent decree relieving White of his debts and providing that the Co-Op had owned White Flame since February 15, 1980.

White and Kuykendall were convicted of tax fraud in January 1981. See *United States* v. *White,* 671 F. 2d 1126 (CA8 1982) (affirming their convictions). Harry Erwin, the managing partner of Russell Brown and Company, an Arkansas accounting firm, testified for White, and shortly thereafter the Co-Op retained Russell Brown to perform its 1981 financial audit. Joe Drozal, a partner in the Brown firm, was put in charge of the audit and Joe Cabaniss was selected to assist him. On January 2, 1982, Russell Brown and Company merged with Arthur Young and Company, which later became respondent Ernst & Young.[2]

One of Drozal's first tasks in the audit was to determine White Flame's fixed-asset value. After consulting with White and reviewing White Flame's books (which Kuykendall had prepared), Drozal concluded that the plant's value at the end of 1980 was $4,393,242.66, the figure Kuykendall had employed. Using this figure as a base, Drozal factored in the 1981 construction costs and capitalized expenses and concluded that White Flame's 1981 fixed-asset value was ap-

---

[2] In order to be consistent with the terminology employed in earlier judicial writings in this case, we hereinafter refer to the respondent firm as "Arthur Young."

proximately $4.5 million. Drozal then had to determine how that value should be treated for accounting purposes. If the Co-Op had owned White Flame from the beginning of construction in 1979, White Flame's value for accounting purposes would be its fixed-asset value of $4.5 million. If, however, the Co-Op had purchased White Flame from White, White Flame would have to be given its fair market value at the time of purchase, which was somewhere between $444,000 and $1.5 million. If White Flame were valued at less than $1.5 million, the Co-Op was insolvent. Drozal concluded that the Co-Op had owned White Flame from the start and that the plant should be valued at $4.5 million on its books.

On April 22, 1982, Arthur Young presented its 1981 audit report to the Co-Op's board. In that audit's Note 9, Arthur Young expressed doubt whether the investment in White Flame could ever be recovered. Note 9 also observed that White Flame was sustaining operating losses averaging $100,000 per month. See *Arthur Young & Co.* v. *Reves,* 937 F. 2d 1310, 1318 (CA8 1991). Arthur Young did not tell the board of its conclusion that the Co-Op always had owned White Flame or that without that conclusion the Co-Op was insolvent.

On May 27, the Co-Op held its 1982 annual meeting. At that meeting, the Co-Op, through Harry C. Erwin, a partner in Arthur Young, distributed to the members condensed financial statements. These included White Flame's $4.5 million asset value among its total assets but omitted the information contained in the audit's Note 9. See 937 F. 2d, at 1318–1319. Cabaniss was also present. Erwin saw the condensed financial statement for the first time when he arrived at the meeting. In a 5-minute presentation, he told his audience that the statements were condensed and that copies of the full audit were available at the Co-Op's office. In response to questions, Erwin explained that the Co-Op owned White Flame and that the plant had incurred approxi-

mately $1.2 million in losses but he revealed no other information relevant to the Co-Op's true financial health.

The Co-Op hired Arthur Young also to perform its 1982 audit. The 1982 report, presented to the board on March 7, 1983, was similar to the 1981 report and restated (this time in its Note 8) Arthur Young's doubt whether the investment in White Flame was recoverable. See 937 F. 2d, at 1320. The gasohol plant again was valued at approximately $4.5 million and was responsible for the Co-Op's showing a positive net worth. The condensed financial statement distributed at the annual meeting on March 24, 1983, omitted the information in Note 8. This time, Arthur Young reviewed the condensed statement in advance but did not act to remove its name from the statement. Cabaniss, in a 3-minute presentation at the meeting, gave the financial report. He informed the members that the full audit was available at the Co-Op's office but did not tell them about Note 8 or that the Co-Op was in financial difficulty if White Flame were written down to its fair market value. *Ibid.*

In February 1984, the Co-Op experienced a slight run on its demand notes. On February 23, when it was unable to secure further financing, the Co-Op filed for bankruptcy. As a result, the demand notes were frozen in the bankruptcy estate and were no longer redeemable at will by the noteholders.

## II

On February 14, 1985, the trustee in bankruptcy filed suit against 40 individuals and entities, including Arthur Young, on behalf of the Co-Op and certain noteholders. The District Court certified a class of noteholders, petitioners here, consisting of persons who had purchased demand notes between February 15, 1980, and February 23, 1984. Petitioners settled with all defendants except Arthur Young. The District Court determined before trial that the demand notes were securities under both federal and state law. See *Robertson* v. *White,* 635 F. Supp. 851, 865 (WD Ark. 1986).

The court then granted summary judgment in favor of Arthur Young on the RICO claim. See *Robertson* v. *White*, Nos. 85–2044, 85–2096, 85–2155, and 85–2259 (WD Ark., Oct. 15, 1986), App. 198–200. The District Court applied the test established by the Eighth Circuit in *Bennett* v. *Berg*, 710 F. 2d 1361, 1364 (en banc), cert. denied *sub nom. Prudential Ins. Co. of America* v. *Bennett*, 464 U. S. 1008 (1983), that § 1962(c) requires "some participation in the operation or management of the enterprise itself." App. 198. The court ruled: "Plaintiffs have failed to show anything more than that the accountants reviewed a series of completed transactions, and certified the Co-Op's records as fairly portraying its financial status as of a date three or four months preceding the meetings of the directors and the shareholders at which they presented their reports. We do not hesitate to declare that such activities fail to satisfy the degree of management required by *Bennett v. Berg.*" *Id.*, at 199–200.

The case went to trial on the state and federal securities fraud claims. The jury found that Arthur Young had committed both state and federal securities fraud and awarded approximately $6.1 million in damages. The Court of Appeals reversed, concluding that the demand notes were not securities under federal or state law. See *Arthur Young & Co.* v. *Reves*, 856 F. 2d 52, 55 (CA8 1988). On writ of certiorari, this Court ruled that the notes were securities within the meaning of § 3(a)(10) of the Securities Exchange Act of 1934, 48 Stat. 882, as amended, 15 U. S. C. § 78c(a)(10). *Reves* v. *Ernst & Young*, 494 U. S. 56, 70 (1990).

On remand, the Court of Appeals affirmed the judgment of the District Court in all major respects except the damages award, which it reversed and remanded for a new trial. See 937 F. 2d, at 1339–1340. The only part of the Court of Appeals' decision that is at issue here is its affirmance of summary judgment in favor of Arthur Young on the RICO claim. Like the District Court, the Court of Appeals applied the "operation or management" test articulated in *Ben-*

*nett* v. *Berg* and held that Arthur Young's conduct did not "rise to the level of participation in the management or operation of the Co-op." See 937 F. 2d, at 1324. The Court of Appeals for the District of Columbia Circuit also has adopted an "operation or management" test. See *Yellow Bus Lines, Inc.* v. *Drivers, Chauffeurs & Helpers Local Union 639*, 286 U. S. App. D. C. 182, 188, 913 F. 2d. 948, 954 (1990) (en banc), cert. denied, 501 U. S. 1222 (1991). We granted certiorari, 502 U. S. 1090 (1992), to resolve the conflict between these cases and *Bank of America National Trust & Savings Assn.* v. *Touche Ross & Co.*, 782 F. 2d 966, 970 (CA11 1986) (rejecting requirement that a defendant participate in the operation or management of an enterprise).

### III

"In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *United States* v. *Turkette*, 452 U. S. 576, 580 (1981), quoting *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980). See also *Russello* v. *United States*, 464 U. S. 16, 20 (1983). Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

The narrow question in this case is the meaning of the phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." The word "conduct" is used twice, and it seems reasonable to give each use a similar construction. See *Sorenson* v. *Secretary of Treasury*, 475 U. S. 851, 860 (1986). As a verb, "conduct" means to lead, run, manage, or direct. Webster's Third New International Dictionary 474 (1976). Petitioners urge us to read "conduct" as "carry on," Brief for Petitioners 23, so that al-

most any involvement in the affairs of an enterprise would satisfy the "conduct or participate" requirement. But context is important, and in the context of the phrase "to conduct . . . [an] enterprise's affairs," the word indicates some degree of direction.[3]

The dissent agrees that, when "conduct" is used as a verb, "it is plausible to find in it a suggestion of control." *Post*, at 187. The dissent prefers to focus on "conduct" as a noun, as in the phrase "participate, directly or indirectly, in the conduct of [an] enterprise's affairs." But unless one reads "conduct" to include an element of direction when used as a noun in this phrase, the word becomes superfluous. Congress could easily have written "participate, directly or indirectly, in [an] enterprise's affairs," but it chose to repeat the word "conduct." We conclude, therefore, that as both a noun and a verb in this subsection "conduct" requires an element of direction.

The more difficult question is what to make of the word "participate." This Court previously has characterized this word as a "ter[m] . . . of breadth." *Russello*, 464 U. S., at 21–22. Petitioners argue that Congress used "participate" as a synonym for "aid and abet." Brief for Petitioners 26. That would be a term of breadth indeed, for "aid and abet" "comprehends all assistance rendered by words, acts, encouragement, support, or presence." Black's Law Dictionary 68 (6th ed. 1990). But within the context of § 1962(c), "participate" appears to have a narrower meaning. We may mark

---

[3] The United States calls our attention to the use of the word "conduct" in 18 U. S. C. § 1955(a), which penalizes anyone who "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business." See Brief for United States as *Amicus Curiae* 13, n. 11; Tr. of Oral Arg. 24–25. This Court previously has noted that the Courts of Appeals have interpreted this statute to proscribe "any degree of participation in an illegal gambling business, except participation as a mere bettor." *Sanabria* v. *United States*, 437 U. S. 54, 70–71, n. 26 (1978). We may assume, however, that "conducts" has been given a broad reading in this context to distinguish it from "manages, supervises, [or] directs."

the limits of what the term might mean by looking again at what Congress did *not* say. On the one hand, "to participate . . . in the conduct of . . . affairs" must be broader than "to conduct affairs" or the "participate" phrase would be superfluous. On the other hand, as we already have noted, "to participate . . . in the conduct of . . . affairs" must be narrower than "to participate in affairs" or Congress' repetition of the word "conduct" would serve no purpose. It seems that Congress chose a middle ground, consistent with a common understanding of the word "participate"—"to take part in." Webster's Third New International Dictionary 1646 (1976).

Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise,[4] but *some* part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply.

## IV

### A

This test finds further support in the legislative history of § 1962. The basic structure of § 1962 took shape in the spring of 1969. On March 20 of that year, Senator Hruska

---

[4] For these reasons, we disagree with the suggestion of the Court of Appeals for the District of Columbia Circuit that § 1962(c) requires "*significant control* over or within an enterprise." *Yellow Bus Lines, Inc.* v. *Drivers, Chauffeurs & Helpers Local Union 639*, 286 U. S. App. D. C. 182, 188, 913 F. 2d 948, 954 (1990) (en banc) (emphasis added), cert. denied, 501 U. S. 1222 (1991).

introduced S. 1623, 91st Cong., 1st Sess., which combined his previous legislative proposals. See Lynch, RICO: The Crime of Being a Criminal, Parts I & II, 87 Colum. L. Rev. 661, 676 (1987); Blakey & Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies, 53 Temp. L. Q. 1009, 1017 (1980). Senate bill 1623 was titled the "Criminal Activities Profits Act" and was directed solely at the investment of proceeds derived from criminal activity.[5] It was § 2(a) of this bill that ultimately became § 1962(a).

On April 18, Senators McClellan and Hruska introduced S. 1861, 91st Cong., 1st Sess., which recast S. 1623 and added provisions that became §§ 1962(b) and (c).[6] See Blakey, The

---

[5] Senate bill 1623 provided in relevant part:

"SEC. 2. (a) Whoever, being a person who has received any income derived directly or indirectly from any criminal activity in which such person has participated as a principal within the meaning of section 2, title 18, United States Code applies any part of such income or the proceeds of any such income to the acquisition by or on behalf of such person of legal title to or any beneficial interest in any of the assets, liabilities, or capital of any business enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce shall be guilty of a felony and shall be fined not more than $10,000, or imprisoned not more than ten years, or both."

[6] Senate bill 1861 provided in relevant part:

"§ 1962. Prohibited racketeering activities

"(a) It shall be unlawful for any person who has knowingly received any income derived, directly or indirectly, from a pattern by [sic] racketeering activity to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

"(b) It shall be unlawful for any person to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce, through a pattern of racketeering activity or through collection of unlawful debt.

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or

RICO Civil Fraud Action in Context: Reflections on *Bennett v. Berg*, 58 Notre Dame L. Rev. 237, 264, n. 76 (1982). The first line of S. 1861 reflected its expanded purpose: "to prohibit the infiltration *or management* of legitimate organizations by racketeering activity or the proceeds of racketeering activity" (emphasis added).

On June 3, Assistant Attorney General Will Wilson presented the views of the Department of Justice on a number of bills relating to organized crime, including S. 1623 and S. 1861, to the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary. Wilson criticized S. 1623 on the ground that "it is too narrow in that it merely prohibits the investment of prohibited funds in a business, but fails to prohibit the control *or operation* of such a business by means of prohibited racketeering activities." Measures Related to Organized Crime: Hearings before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 387 (1969) (emphasis added). He praised S. 1861 because the "criminal provisions of the bill contained in Section 1962 are broad enough to cover most of the methods by which ownership, control *and operation* of business concerns are acquired." *Ibid.* (emphasis added). See Blakey, *supra*, at 258, n. 59.

With alterations not relevant here, S. 1861 became Title IX of S. 30. The House and Senate Reports that accompanied S. 30 described the three-part structure of § 1962:

> "(1) making unlawful the receipt or use of income from 'racketeering activity' or its proceeds by a principal in commission of the activity to acquire an interest in or establish an enterprise engaged in interstate commerce; (2) prohibiting the acquisition of any enterprise engaged in interstate commerce through a 'pattern' of 'racketeer-

---

foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

ing activity;' and (3) proscribing the *operation of any enterprise* engaged in interstate commerce through a 'pattern' of 'racketeering activity.' " H. R. Rep. No. 91–1549, p. 35 (1970); S. Rep. No. 91–617, p. 34 (1969) (emphasis added).

In their comments on the floor, Members of Congress consistently referred to subsection (c) as prohibiting the *operation* of an enterprise through a pattern of racketeering activity and to subsections (a) and (b) as prohibiting the *acquisition* of an enterprise.[7] Representative Cellar, who was chairman of the House Judiciary Committee that voted RICO out in 1970, described § 1962(c) as proscribing the "conduct of the affairs of a business by a person acting in a *managerial* capacity, through racketeering activity." 116 Cong. Rec. 35196 (1970) (emphasis added).

Of course, the fact that Members of Congress understood § 1962(c) to prohibit the operation or management of an enterprise through a pattern of racketeering activity does not necessarily mean that they understood § 1962(c) to be limited to the operation or management of an enterprise. Cf. *Turkette*, 452 U. S., at 591 (references to the infiltration of legitimate organizations do not "requir[e] the negative inference that [RICO] did not reach the activities of enterprises organized and existing for criminal purposes"). It is clear from other remarks, however, that Congress did not intend RICO to extend beyond the acquisition or operation of an enter-

---

[7] See, *e. g.*, 116 Cong. Rec. 607 (1970) (remarks of Sen. Byrd of West Virginia) ("to acquire an interest in businesses . . . , or to acquire or operate such businesses by racketeering methods"); *id.*, at 36294 (remarks of Sen. McClellan) ("to acquire an interest in a business . . . , to use racketeering activities as a means of acquiring such a business, or to operate such a business by racketeering methods"); *id.*, at 36296 (remarks of Sen. Dole) ("using the proceeds of racketeering activity to acquire an interest in businesses engaged in interstate commerce, or to acquire or operate such businesses by racketeering methods"); *id.*, at 35227 (remarks of Rep. Steiger) ("the use of specified racketeering methods to acquire or operate commercial organizations").

prise. While S. 30 was being considered, critics of the bill raised concerns that racketeering activity was defined so broadly that RICO would reach many crimes not necessarily typical of organized crime. See 116 Cong. Rec. 18912–18914, 18939–18940 (1970) (remarks of Sen. McClellan). Senator McClellan reassured the bill's critics that the critical limitation was not to be found in § 1961(1)'s list of predicate crimes but in the statute's other requirements, including those of § 1962:

> "The danger that commission of such offenses by other individuals would subject them to proceedings under title IX [RICO] is even smaller than any such danger under title III of the 1968 [Safe Streets] [A]ct, since commission of a crime listed under title IX provides only one element of title IX's prohibitions. Unless an individual not only commits such a crime but engages in a pattern of such violations, and uses that pattern to obtain or operate an interest in an interstate business, he is not made subject to proceedings under title IX." 116 Cong. Rec., at 18940.

Thus, the legislative history confirms what we have already deduced from the language of § 1962(c)—that one is not liable under that provision unless one has participated in the operation or management of the enterprise itself.

## B

RICO's "liberal construction" clause does not require rejection of the "operation or management" test. Congress directed, by § 904(a) of Pub. L. 91–452, 84 Stat. 947, see note following 18 U. S. C. § 1961, p. 438, that the "provisions of this title shall be liberally construed to effectuate its remedial purposes." This clause obviously seeks to ensure that Congress' intent is not frustrated by an overly narrow reading of the statute, but it is not an invitation to apply RICO to new purposes that Congress never intended. Nor does the

clause help us to determine what purposes Congress had in mind. Those must be gleaned from the statute through the normal means of interpretation. The clause "'only serves as an aid for resolving an ambiguity; it is not to be used to beget one.'" *Sedima, S. P. R. L.* v. *Imrex Co.,* 473 U. S. 479, 492, n. 10 (1985), quoting *Callanan* v. *United States,* 364 U. S. 587, 596 (1961). In this case it is clear that Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity.[8]

## V

Petitioners argue that the "operation or management" test is flawed because liability under § 1962(c) is not limited to upper management but may extend to "any person employed by or associated with [the] enterprise." Brief for Petitioners 37–40. We agree that liability under § 1962(c) is not limited to upper management, but we disagree that the "operation or management" test is inconsistent with this proposition. An enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management.[9] An enterprise also might be "operated" or "managed" by others "associated with" the enterprise who exert control over it as, for example, by bribery.

The United States also argues that the "operation or management" test is not consistent with § 1962(c) because it lim-

---

[8] Because the meaning of the statute is clear from its language and legislative history, we have no occasion to consider the application of the rule of lenity. We note, however, that the rule of lenity would also favor the narrower "operation or management" test that we adopt.

[9] At oral argument, there was some discussion about whether low-level employees could be considered to have participated in the conduct of an enterprise's affairs. See Tr. of Oral Arg. 12, 25–27. We need not decide in this case how far § 1962(c) extends down the ladder of operation because it is clear that Arthur Young was not acting under the direction of the Co-Op's officers or board.

its the liability of "outsiders" who have no official position within the enterprise. Brief for United States as *Amicus Curiae* 12 and 15. The United States correctly points out that RICO's major purpose was to attack the "infiltration of organized crime and racketeering into legitimate organizations," S. Rep. No. 91–617, at 76, but its argument fails on several counts. First, it ignores the fact that § 1962 has four subsections. Infiltration of legitimate organizations by "outsiders" is clearly addressed in subsections (a) and (b), and the "operation or management" test that applies under subsection (c) in no way limits the application of subsections (a) and (b) to "outsiders."[10] Second, § 1962(c) is limited to persons "employed by or associated with" an enterprise, suggesting a more limited reach than subsections (a) and (b), which do not contain such a restriction. Third, § 1962(c) cannot be interpreted to reach complete "outsiders" because liability depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs," not just their *own* affairs. Of course, "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise and participate in the conduct of *its* affairs—that is, participate in the operation or management of the enterprise itself—but it would be consistent with neither the language nor the legislative history of § 1962(c) to interpret it as broadly as petitioners and the United States urge.

In sum, we hold that "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs," § 1962(c), one must participate in the operation or management of the enterprise itself.

## VI

Both the District Court and the Court of Appeals applied the standard we adopt today to the facts of this case, and both found that respondent was entitled to summary judg-

---

[10] Subsection (d) makes it unlawful to conspire to violate any of the other three subsections.

ment.   Neither petitioners nor the United States have argued that these courts misapplied the "operation or management" test.   The dissent argues that by creating the Co-Op's financial statements Arthur Young participated in the management of the Co-Op because "'financial statements are management's responsibility.'"   *Post*, at 190, quoting 1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982). Although the professional standards adopted by the accounting profession may be relevant, they do not define what constitutes management of an enterprise for the purposes of § 1962(c).

In this case, it is undisputed that Arthur Young relied upon existing Co-Op records in preparing the 1981 and 1982 audit reports.   The AICPA's professional standards state that an auditor may draft financial statements in whole or in part based on information from management's accounting system.   See *ibid.*   It is also undisputed that Arthur Young's audit reports revealed to the Co-Op's board that the value of the gasohol plant had been calculated based on the Co-Op's investment in the plant.   See App. in No. 87–1726 (CA8), pp. 250–251, 272–273.   Thus, we only could conclude that Arthur Young participated in the operation or management of the Co-Op itself if Arthur Young's failure to tell the Co-Op's board that the plant should have been given its fair market value constituted such participation.   We think that Arthur Young's failure in this respect is not sufficient to give rise to liability under § 1962(c).

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE WHITE joins, dissenting.

In the word "conduct," the Court today finds a clear congressional mandate to limit RICO liability under 18 U. S. C. § 1962(c) to participants in the "operation or management"

of a RICO enterprise. *Ante,* at 177–179. What strikes the Court as clear, however, looks at the very least hazy to me, and I accordingly find the statute's "liberal construction" provision not irrelevant, but dispositive. But even if I were to assume, with the majority, that the word "conduct" clearly imports some degree of direction or control into § 1962(c), I would have to say that the majority misapplies its own "operation or management" test to the facts presented here. I therefore respectfully dissent.

The word "conduct" occurs twice in § 1962(c), first as a verb, then as a noun.

> "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U. S. C. § 1962(c).

Although the Court is surely correct that the cognates should receive consistent readings, see *ante,* at 177, and correct again that "context is important" in coming to understand the sense of the terms intended by Congress, *ante,* at 178, the majority goes astray in quoting only the verb form of "conduct" in its statement of the context for divining a meaning that must fit the noun usage as well. Thus, the majority reaches its pivotal conclusion that "in the context of the phrase 'to conduct . . . [an] enterprise's affairs,' the word indicates some degree of direction." *Ibid.* (footnote omitted). To be sure, if the statutory setting is so abbreviated as to limit consideration to the word as a verb, it is plausible to find in it a suggestion of control, as in the phrase "to conduct an orchestra." (Even so, the suggestion is less than emphatic, since even when "conduct" is used as a verb, "[t]he notion of direction or leadership is often obscured or lost; e. g. an investigation is *conducted* by all those who take

part in it." 3 Oxford English Dictionary 691 (2d ed. 1989) (emphasis in original).)

In any event, the context is not so limited, and several features of the full subsection at issue support a more inclusive construction of "conduct." The term, when used as a noun, is defined by the majority's chosen dictionary as, for example, "carrying forward" or "carrying out," Webster's Third New International Dictionary 473 (1976), phrases without any implication of direction or control. The suggestion of control is diminished further by the fact that § 1962(c) covers not just those "employed by" an enterprise, but those merely "associated with" it, as well. And associates (like employees) are prohibited not merely from conducting the affairs of an enterprise through a pattern of racketeering, not merely from participating directly in such unlawful conduct, but even from indirect participation in the conduct of an enterprise's affairs in such a manner. The very breadth of this prohibition renders the majority's reading of "conduct" rather awkward, for it is hard to imagine how the "operation or management" test would leave the statute with the capacity to reach the indirect participation of someone merely associated with an enterprise. I think, then, that this contextual examination shows "conduct" to have a long arm, unlimited by any requirement to prove that the activity includes an element of direction. But at the very least, the full context is enough to defeat the majority's conviction that the more restrictive interpretation of the word "conduct" is clearly the one intended.[1]

---

[1] The Court attempts to shore up its interpretation with an examination of relevant legislative materials. See *ante*, at 179–183. The legislative history demonstrates only that when Members of Congress needed a shorthand method of referring to § 1962(c), they spoke of prohibiting "the operation" of an enterprise through a pattern of racketeering activity. As Arthur Young points out, "operation" is essentially interchangeable with "conduct"; each term can include a sense of direction, but each is also definable as "carrying on" or "carrying out." Brief for Respondent

What, then, if we call it a tie on the contextual analysis? The answer is that Congress has given courts faced with uncertain meaning a clear tiebreaker in RICO's "liberal construction" clause, which directs that the "provisions of this title shall be liberally construed to effectuate its remedial purposes." Pub. L. 91–452, § 904(a), 84 Stat. 947, note following 18 U. S. C. § 1961. We have relied before on this "express admonition" to read RICO provisions broadly, see *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 497–498 (1985), and in this instance, the "liberal construction" clause plays its intended part, directing us to recognize the more inclusive definition of the word "conduct," free of any restricting element of direction or control.[2] Because the Court of Appeals employed a narrower reading, I would reverse.

Even if I were to adopt the majority's view of § 1962(c), however, I still could not join the judgment, which seems to me unsupportable under the very "operation or management" test the Court announces. If Arthur Young had confined itself in this case to the role traditionally performed by an outside auditor, I could agree with the majority that Arthur Young took no part in the management or operation of the Farmer's Cooperative of Arkansas and Oklahoma, Inc. (Co-op). But the record on summary judgment, viewed

---

22. There is no indication that the congressional shorthand was meant to attend to the statutory nuance at issue here. As the Court concedes, "[T]he fact that Members of Congress understood § 1962(c) to prohibit the operation or management of an enterprise through a pattern of racketeering activity does not necessarily mean that they understood § 1962(c) to be limited to the operation or management of an enterprise." *Ante,* at 182.

[2] The majority claims that without an element of direction, the word "conduct," when it appears as a noun, becomes superfluous. *Ante,* at 178. Given the redundant language Congress has chosen for § 1962(c), however, any consistent reading of "conduct" will tend to make one of its two appearances superfluous.

most favorably to Reves,[3] shows that Arthur Young created the very financial statements it was hired, and purported, to audit. Most importantly, Reves adduced evidence that Arthur Young took on management responsibilities by deciding, in the first instance, what value to assign to the Co-op's most important fixed asset, the White Flame gasohol plant, and Arthur Young itself conceded below that the alleged activity went beyond traditional auditing. Because I find, then, that even under the majority's "operation or management" test the Court of Appeals erroneously affirmed the summary judgment for Arthur Young, I would (again) reverse.

For our purposes, the line between managing and auditing is fairly clear. In describing the "respective responsibilities of management and auditor," Arthur Young points to the Code of Professional Conduct developed by the American Institute of Certified Public Accountants (AICPA). Brief for Respondent 31. This auditors' code points up management's ultimate responsibility for the content of financial statements:

> "The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. . . . The independent auditor may make

---

[3] In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 255 (1986). My description of the facts, based primarily on the District Court's view of the evidence at summary judgment, conforms to this standard.

suggestions about the form or content of the financial statements or draft them, in whole or in part, based on information from management's accounting system." 1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982).

In short, management chooses the assertions to appear in financial statements; the auditor "simply expresses an opinion on the client's financial statements." Brief for Respondent 30. These standards leave no doubt that an accountant can in no sense independently audit financial records when he has selected their substance himself. See *In re Thomas P. Reynolds Securities, Ltd.*, Exchange Act Release No. 29689, 1991 SEC LEXIS 1855, *6–*7 (Sept. 16, 1991) ("A company may, of course, rely on an outside firm to prepare its books of account and financial statements. However, once an accounting firm performs those functions, it has become identified with management and may not perform an audit").

The evidence on summary judgment, read favorably to Reves, indicates that Arthur Young did indeed step out of its auditing shoes and into those of management, in creating the financial record on which the Co-op's solvency was erroneously predicated. The Co-op's 1980 financial statement gave no fixed-asset value for the White Flame gasohol plant (although the statement did say that the Co-op had advanced the plant $4.1 million during 1980, App. in No. 87–1726 (CA8), pp. 291, 295), and there is no indication that a valuation statement occurred anywhere else in the Co-op's records at that time. When Arthur Young accepted the job of preparing the Co-op's financial statement for 1981, the value to be given the plant was a matter of obvious moment. Instead of declaring the plant's valuation to be the Co-op's responsibility, and instead even of turning to management for more reliable information about the plant's value, Arthur Young basically set out to answer its own questions and to come up with its own figure for White Flame's fixed-asset value. In doing so,

it repeatedly made choices calling for the exercise of a judgment that belonged to the Co-op's management in the first instance.

Arthur Young realized it could not rely on White Flame's 1980 financial statement, which had been prepared by a convicted felon (who also happened to be the Co-op's former accountant),[4] see *Arthur Young & Co.* v. *Reves,* 937 F. 2d 1310, 1316–1317 (CA8 1991), and an internal memo that appears in the record shows that Arthur Young had a number of serious questions about White Flame's cost figures for the plant. See App. in No. 87–1726, *supra,* at 1189–1191. Nonetheless, Arthur Young "essentially invented" a cost figure that matched, to the penny, the phoney figure that Kuykendall, White Flame's convicted accountant, had created. App. 138–140. With this "invented" cost figure in hand, Arthur Young then proceeded to decide, again without consulting management, when the Co-op had acquired White Flame. Although the Co-op's 1980 financial statement indicated an acquisition of White Flame in February 1980, as did a local court decree, see App. in No. 87–1726, *supra,* at 295, 1212–1214, Arthur Young "adopted a blatant fiction—that the Co-op [had] owned the entire plant at its inception in May, 1979—in order to justify carrying the asset on [the Co-op's] books at its total cost, as if the Co-op had built it from scratch." App. 137. Apparently, the idea that the Co-op had owned the gasohol plant since 1979 was reflected nowhere in the Co-op's books, and Arthur Young was solely

---

[4] Gene Kuykendall, the Co-op's previous "independent auditor," was involved in keeping the Co-op's books in addition to preparing and "auditing" financial statements for White Flame. See *Arthur Young & Co.* v. *Reves,* 937 F. 2d 1310, 1316–1317 (CA8 1991); *United States* v. *White,* 671 F. 2d 1126 (CA8 1982); *Robertson* v. *White,* 633 F. Supp. 954 (WD Ark. 1986). Thus, the Co-op had a history of relying on "outside" auditors for such services.

responsible for the Co-op's decision to treat the transaction in this manner.[5]

Relying on this fiction, the unreality of which it never shared with the Co-op's board of directors,[6] let alone the

---

[5] If Arthur Young had decided otherwise, the value of White Flame on the Co-op's books would have been its fair market value at the time of sale—three to four million dollars less. See *ante,* at 174. The "blatant fiction" created by Arthur Young maintained the Co-op's appearance of solvency and made Jack White's management "look better." App. 137–138. The District Court noted some plausible motives for Arthur Young's conduct, including a desire to keep the Co-op's business and the accountants' need "to cover themselves for having testified on behalf of White and Kuykendall in [their] 1981 criminal trial." App. 136.

The majority asserts, as an "undisputed" fact, "that Arthur Young relied upon existing Co-Op records in preparing the 1981 and 1982 audit reports." *Ante,* at 186. In fact, however, the District Court found that Reves had presented evidence sufficient to show that Arthur Young "essentially invented" a cost figure for White Flame (after examining White Flame records created by Kuykendall). See App. 138–140. Since the Co-op's 1980 financial statement indicated that the Co-op had advanced White Flame only $4.1 million through the end of 1980, see *supra,* at 191, Arthur Young could not have relied on the Co-op's records in concluding that the plant's value was nearly $4.4 million at the end of 1980. See 937 F. 2d, at 1317. The District Court also found sufficient evidence in the record to support the conclusion that Arthur Young had created the "blatant fiction" that the Co-op had owned White Flame from its inception, despite overwhelming evidence to the contrary in the Co-op's records. See App. 137–138; see also 937 F. 2d, at 1317 ("In concluding that the Co-op had always owned White Flame, [Arthur Young] ignored a great deal of information suggesting exactly the opposite"). The evidence indicates that it was creative accounting, not reliance on the Co-op's books, that led Arthur Young to treat the Co-op as the plant's owner from the time of its construction in 1979 (a conclusion necessary to support Arthur Young's decision to value the plant at total cost). Not even the decree procured in the friendly lawsuit engineered by White and his lawyers treated the Co-op as building the plant, or as owning it before February 1980. See *ante,* at 173.

[6] See 937 F. 2d, at 1318. In fact, Note 9 to the 1981 financial statement continued to indicate that the Co-op "acquired legal ownership" of White Flame in February 1980. App. in No. 87–1726 (CA8), p. 250.

membership, Arthur Young prepared the Co-op's 1981 financial statement and listed a fixed-asset value of more than $4.5 million for the gasohol plant. App. in No. 87–1726 (CA8), p. 238. Arthur Young listed a similar value for White Flame in the Co-op's financial statement for 1982. *Id.*, at 261. By these actions, Arthur Young took on management responsibilities, for it thereby made assertions about the fixed-asset value of White Flame that were derived, not from information or any figure provided by the Co-op's management, but from its own financial analysis.

Thus, the District Court, after reviewing this evidence, concluded that petitioners could show from the record that Arthur Young had "created the Co-op's financial statements." App. 199. The court also took note of evidence supporting petitioners' allegation that Arthur Young had "participated in the creation of condensed financial statements" that were handed out each year at the annual meeting of the Co-op. *Ibid.* Before the Court of Appeals, although Arthur Young disputed petitioners' claim that it had been functioning as the Co-op's *de facto* chief financial officer, Supplemental Reply Brief on Remand for Appellant in No. 87–1726 (CA8), p. 2, it did not dispute the District Court's conclusion that Reves had presented evidence showing that Arthur Young had created the Co-op's financial statements and had participated in the creation of condensed financial statements. Supplemental Brief on Remand for Appellant in No. 87–1726 (CA8), p. 20. Instead, Arthur Young argued that "[e]ven if, as here, the alleged activity goes beyond traditional auditing, it was neither an *integral* part of the management of the Co-op's affairs nor part of a *dominant*, active ownership or managerial role." *Id.*, at 21 (emphasis added).

It was only by ignoring these crucial concessions, and the evidence that obviously prompted them, that the Court of Appeals could describe Arthur Young's involvement with the

Co-op as "limited to the audits, meetings with the Board of Directors to explain the audits, and presentations at the annual meetings." 937 F. 2d, at 1324. And only then could the court have ruled that, "as a matter of law, Arthur Young's involvement with the Co-op did not rise to the level required for a RICO violation," which it described (quoting *Bennett* v. *Berg*, 710 F. 2d 1361 (CA8 1983)) as requiring only "some participation in the operation or management of the enterprise itself." 937 F. 2d, at 1324 (internal quotation marks omitted).

But petitioners' evidence and respondent's concessions of activity going beyond outside auditing can neither be ignored nor declared irrelevant. As the Court explains today, " 'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of *its* affairs—that is, participate in the operation or management of the enterprise itself . . . ." *Ante*, at 185 (emphasis in original). Thus, the question here is whether Arthur Young, which was "associated with" the Co-op, "participated" in the Co-op's operation or management. As the Court has noted, "participate" should be read broadly in this context, see *ante*, at 178 (citing *Russello* v. *United States*, 464 U. S. 16, 21–22 (1983)), since Congress has provided that even "indirect" participation will suffice. Cf. *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S., at 497–498 ("Congress' self-consciously expansive language" supports the conclusion that "RICO is to be read broadly").

The evidence petitioners presented in opposing the motion for summary judgment demonstrated Arthur Young's "participation" in this broad sense. By assuming the authority to make key decisions in stating the Co-op's own valuation of its major fixed asset, and by creating financial statements that were the responsibility of the Co-op's management, Arthur Young crossed the line separating "outside" auditors from "inside" financial managers. Because the majority, like

the Court of Appeals, affirms the grant of summary judgment in spite of this evidence, I believe that it misapplies its own "operation or management" test, and I therefore respectfully dissent.