*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0153P (6th Cir.)
File Name: 00a0153p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SANDRA VANDENBROECK, an individual; EUGENE NICHOSON and CAROL NICHOSON, husband and wife; ABEL SOTO and DENISE SOTO, husband and wife,
  *Plaintiffs and Class Representatives-Appellants,*

*v.*

COMMONPOINT MORTGAGE COMPANY, fka Anderson Realty, Inc., fka Allstate Mortgage & Financial Corporation, fka AAA Mortgage & Financial Corporation, d/b/a CommonPoint Mortgage; MICHAEL ANDERSON, an individual,
  *Defendants-Appellees.*

No. 98-2266

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 97-00826—Gordon J. Quist, District Judge.

1

Argued:  March 16, 2000

Decided and Filed:  May 1, 2000

Before:  MERRITT, NELSON, and DAUGHTREY,Circuit Judges.

_____

**COUNSEL**

**ARGUED:** John E. Anding, DREW, COOPER & ANDING, Grand Rapids, Michigan, for Appellants. John C. Englander, GOODWIN, PROCTOR & HOAR, Boston, Massachusetts, for Appellees. **ON BRIEF:** John E. Anding, Christopher G. Hastings, DREW, COOPER & ANDING, Grand Rapids, Michigan, for Appellants.  John C. Englander, James W. McGarry, GOODWIN, PROCTOR & HOAR, Boston, Massachusetts, Thomas M. Hefferon, GOODWIN, PROCTOR & HOAR, Washington, D.C., for Appellees.

_____

**OPINION**

_____

    MERRITT, Circuit Judge.  This is a section 1962(c) RICO fraud case,[1] brought by borrowers who allege that the defendant lender, CommonPoint Mortgage Company, engaged in a pattern of racketeering activity consisting of mail and wire fraud.  The gist of the case is that the lender's undisclosed fees were unreasonable. The appeal arises from the district court's decision to grant the lender's motion to

_____

    [1]Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act provides that "[i]t shall be unlawful for any person employed by or associated with any *enterprise* . . . to conduct . . . such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c) (1999) (emphasis added).

particularity" which would show either intent to defraud or reliance on the alleged misrepresentation.  While in some cases intent can be inferred from the facts, the differing definitions of "loan discount" and "discount point" clearly indicate that intent cannot be inferred in this case.  There may have been some confusion about the meaning of "points" and "discount," but such confusion does not amount to fraud. Likewise, reliance cannot be inferred from the mere act of entering into the transaction because plaintiffs simply wanted a loan, and there is no showing that they expected a below-market rate.  In light of the fact that the borrowers had questionable credit, could not get loans from regular lenders, and had to turn to a "subprime" lender, there is no basis for the proposition that they expected a below-market rate.

    Although the district court declined to reach this issue, we may affirm the district court's opinion on different grounds. *See Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999). We find that plaintiffs have failed to plead the elements of fraud with sufficient specificity, having failed to allege or proffer any evidence showing an intentional misrepresentation and reliance thereon. We therefore hold that plaintiffs have failed to adequately allege or proffer evidence of the predicate acts of mail fraud and wire fraud which form the basis of their RICO claim.  Accordingly, we AFFIRM the decision of the district court on this ground.

within a fiduciary relationship as well as in other circumstances. *See, e.g., Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384 (6th Cir. 1996) (applying the elements of fraud to the RICO claim of a car buyer against the bank who financed his car purchase).

Plaintiffs allege that CommonPoint made a material misrepresentation to its customers when it charged a "loan discount" without providing a corresponding decrease in their interest rate. They rely upon the glossary of terms which defendants provided to their customers. That glossary defines a "discounted loan" to mean that "[w]hen the note rate on a loan is less than the market rate, the lender requires additional points to raise the yield on the loan to the market rate." J.A. at 238. In addition, plaintiffs argue that a HUD pamphlet for buyers defines a "loan discount" as a "one time charge imposed by the lender or broker to lower the rate at which the lender or broker would otherwise offer the loan to you." J.A. at 259.

In response, defendants argue that the "loan discount"-- which was charged directly beneath the designated loan origination fee on the standard form loan agreement CommonPoint employed--is simply a form of points like an origination fee assessed to cover the administrative costs of the loan. For proof of this, they offer the same two documents which plaintiffs brought to the attention of the court. First, they argue that the glossary used by CommonPoint also included a definition of a "discount point" which was an "[a]mount payable to the lending institution by the borrower or seller to increase the lender's effective yield. One point is equal to one percent of the loan amount." J.A. at 238. In addition, they argue that the same HUD pamphlet relied on by plaintiffs points out that the term "loan discount" is often also called "points" or "discount points." J.A. at 259.

It seems doubtful that the use of the language "loan discount" was a misrepresentation under these circumstances, but it is clear that plaintiffs have failed to allege facts "with

dismiss with respect to the RICO claim and the several Truth in Lending Act claims of the plaintiffs. In addition, Judge Quist denied the plaintiffs' motion for leave to amend the complaint to include an additional Truth in Lending Act claim and to correct any deficiencies in the existing claims. Plaintiffs now appeal the court's decision to dismiss their RICO claim, and further appeal the district court's denial of their motion to amend the complaint to correct any deficiencies which the court found. Plaintiffs do not appeal the decision to dismiss the original Truth in Lending Act claims. The district court dismissed the RICO claim on the ground that the complaint failed to allege a proper RICO "enterprise" and did not reach the question of whether the complaint properly alleged fraud. We agree with the district court that the "enterprise" element of the RICO tort is defective, but we think this defect could be remedied by amendment. The fraud element is also defective, and we conclude that it cannot be remedied by amendment. Hence we affirm the judgment of the district court.

## I. Allegations of Complaint

Plaintiffs, as representatives of their class, are several customers of CommonPoint Mortgage Company. CommonPoint Mortgage is a so-called "subprime" lender, which makes loans for people with poor credit who have difficulty obtaining them on their own and then sells the loans in the secondary market. CommonPoint routinely asked their customers to sign a "financial services agreement." That agreement provided that CommonPoint would do its best to obtain a loan, and if a loan was provided by a third party, CommonPoint would be entitled to a fee from the customer equal to a certain percentage of the principal of the loan. The allegation and general theory of plaintiffs' case is that the "financial services agreement" made CommonPoint the agent or fiduciary of a customer for the purpose of securing a loan from a third party, but that CommonPoint in fact made the loan itself rather than seeking a third party lender, and charged "unconscionable and hidden fees" in the process of

doing so. Plaintiffs contend that some of CommonPoint's customers were charged front-end "discount fees," which were typically 2-5% of the loan amount in the instances in which they were charged. In the case of class representative VanDenBroeck, for instance, the discount fee was 5% of the loan amount on her $63,000 loan, or $3,150, which was similar to the origination fee charged. Plaintiffs allege that these so-called "discount fees" are supposed to insure lower interest rates, but that CommonPoint not only failed to actually lower the interest rates, it routinely inflated the interest rate even though a lower interest rate could have been obtained. The interest rates charged the class representatives in this case ranged from 13-16%. In response to this allegation, defendant argues that the "discount fees" were really only typical "points" or origination fees assessed as a normal byproduct of obtaining a loan, and were in no way fraudulent. After closing on the loans, CommonPoint routinely sold the loans to one of a number of secondary market lenders who paid CommonPoint a fee based upon the difference between CommonPoint's loan rate and the secondary lender's rate for the same loan. This was referred to as the "upsell" or "backend fee." Plaintiffs further allege that the interest rates ultimately received often exceeded the interest rates promised in the financial services agreement, and that defendant failed to inform plaintiffs that the loans were made at a higher rate than could have been obtained.

## II. The "Enterprise"

Plaintiffs claimed that this scheme between CommonPoint and the secondary lenders with which it dealt constituted a RICO association-in-fact "enterprise" under 18 U.S.C. § 1962(c) (1999) (see footnote 1 for text of § 1962(c)). In order to prove a violation of that Act, the plaintiffs must show 1) that there were two or more predicate offenses; 2) that an "enterprise" existed; 3) that there was a nexus between the pattern of racketeering activity and the enterprise; and 4) that an injury to business or property occurred as a result of the above three factors. *See Frank v. D'Ambrosi*, 4 F.3d 1378,

fraud claim to determine whether plaintiff has alleged the elements of fraud with sufficient specificity to allow this case to proceed.

## IV. Sufficiency of Allegations of Fraud

According to Rule 9(b) of the Federal Rules of Civil Procedure, in a complaint alleging fraud "the circumstances constituting fraud . . . shall be stated with particularity." *See Advocacy Organization for Patients and Providers v. Auto Club Insurance Assoc.*, 176 F.3d 315, 322 (6th Cir. 1999). In this case, plaintiffs argue that mail fraud and wire fraud are the predicate acts which form the basis of their RICO claim. Mail fraud and wire fraud are proven by showing a scheme or artifice to defraud combined with either a mailing or an electronic communication for the purpose of executing the scheme.

We have defined a scheme to defraud as "'intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end.'" *Kenty v. Bank One, Columbus, N.A.,* 92 F.3d 384, 389-90 (6th Cir. 1996) (quoting *Bender v. Southland Corp.*, 749 F.2d 1205, 1215-16 (6th Cir. 1984)). In other words, in order to present a cognizable claim for fraud, the plaintiffs must show that CommonPoint Mortgage made a material misrepresentation of fact that was calculated or intended to deceive persons of reasonable prudence and comprehension, and must also show that plaintiffs in fact relied upon that material misrepresentation. *See id.* at 390.

Plaintiff argues that due to the agency or "fiduciary" nature of the relationship between CommonPoint and its customers-- wherein CommonPoint was to act as the customers' agent for the purpose of securing a loan--plaintiff is relieved of the burden of proving intent and reliance and must only prove a misrepresentation of fact. That argument is meritless. Our cases make clear that the elements of fraud must be proven

that the corporation itself constituted the enterprise, plaintiffs expressed concern that some Circuits have held that a sole shareholder of a corporation cannot be considered sufficiently distinct from the corporation itself to justify a holding that he was "conspiring" with the corporation. According to this way of conceptualizing the sole shareholder's status under RICO, a sole shareholder is equivalent to the corporation he owns and therefore he cannot conspire with himself. Mr. Anderson is the sole shareholder, President, and Treasurer of CommonPoint Mortgage.

This concern is misplaced. In *Fleischhauer v. Feltner*, 879 F.2d 1290 (6th Cir. 1989), we adopted the holding of *United States v. Feldman*, 853 F.2d 648 (9th Cir. 1988). In *Feldman,* the Ninth Circuit held that a sole shareholder was sufficiently distinct from his corporation by virtue of both the legal shield which the corporate form provides as well as the existence of employees and activities apart from the sole shareholder. The court concluded that a RICO 'person' can be the sole shareholder in a corporate 'enterprise' which forms the basis of a RICO action. *See Feldman*, 853 F.3d at 656. That court further concluded that a defendant who is the sole shareholder in each of several corporations associated-in-fact could also form the basis for a RICO action. *See Feldman,* 853 F.3d at 656.

We adopted the second holding of the *Feldman* case, which necessarily included the first holding. *See Fleischhauer,* 879 F.2d at 1297 ("[T]he fact that Feltner owned 100% of the corporations' shares does not vitiate the fact that these corporations were separate legal entities.") The district court did not err because it was not presented with this theory of enterprise liability, but we do conclude that amendment would not be futile in this case, based on the fact that plaintiffs could allege that CommonPoint Mortgage alone was the enterprise which was engaged in a pattern of racketeering activity. Given that plaintiffs perhaps should now be allowed to amend on the enterprise element if they otherwise have a plausible case, we will address the merits of the underlying

1385 (6th Cir. 1993). In addition, the Supreme Court has held that in order to be held responsible under the Act, a defendant must have not only participated in the scheme, but must have also participated in the operation or management of the enterprise itself. *See Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993); *see also Stone v. Kirk*, 8 F.3d 1079, 1091 (6th Cir. 1993). The district court dismissed plaintiff's RICO claim for failure to show the existence of an "enterprise" and failure to show that defendants exerted control over an "enterprise," and therefore declined to address the further allegation that plaintiffs had failed to adequately allege that defendants committed the predicate acts of federal mail and wire fraud.

The Supreme Court has defined an "enterprise" under the Act as a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). An association-in-fact enterprise can be proven by showing 1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged. *See Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993).

The association-in-fact enterprise alleged to exist in this case includes CommonPoint and its relationship with the numerous secondary lenders to which it sells customers' loans. The district court correctly recognized that the elements outlined above have been interpreted to require a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach. That is, simply conspiring to commit a fraud is not enough to trigger the Act if the parties are not organized in a fashion that would enable them to function as a racketeering organization for other purposes. Plaintiffs' brief agrees, noting that the "hallmark of a RICO enterprise is its ability to exist apart from the pattern of wrongdoing." Brief for Appellant at 13. All that is

required is some minimal level of organizational structure between the entities involved.

The district court noted that four steps were undertaken in the current scheme. First, CommonPoint obtained the borrower. Second, a secondary lender determined an interest rate at which it would make a loan. Third, CommonPoint made a loan to the borrower at a different rate based on the secondary lender's proposed interest rate. Fourth, the loan was sold to the secondary lender and CommonPoint collected a "backend" fee. The parties have pointed out that there were dozens of secondary lenders purchasing the loans. There is no allegation that there were a discreet number of secondary lenders that were used, which means that this conspiracy could have transpired with any lender in the secondary lending market. The district court found that these facts do not show any type of mechanism by which this "group" (CommonPoint and the entire secondary lending market) conducted its affairs or made decisions.

Most cases interpreting the elements applicable to this statute require evidence of some sort of "chain of command" or other evidence of a hierarchy, even a highly limited one. Evidence of any such hierarchical structure is absent from this appeal. Although plaintiffs argue that CommonPoint's routine use of the "Approval Advice" form--which assured ultimate approval of a loan by a secondary lender before CommonPoint issued its own loan to the customer--was evidence of the enterprise, the use of those forms seems to indicate nothing more than that CommonPoint had a business relationship with the secondary lenders. It does not allege or show that they "function[ed] as a continuous unit." *Turkette*, 452 U.S. at 583. Due to the fact that the enterprise alleged to exist in this case is too unstable and fluid an entity to constitute a RICO enterprise, we must AFFIRM the district court's holding on this issue. In light of this holding, it is unnecessary for this court to further consider the plaintiffs' appeal based on their contention that the district court erred in determining that CommonPoint did not exert sufficient

control over the alleged enterprise under the holding of *Reves v. Ernst & Young*, 507 U.S. 170 (1993).

### III.  The Motion to Amend

Plaintiffs also challenge the district court's denial of their motion to amend the complaint. Denial of a motion to amend is reviewed for abuse of discretion. *See Vild v. Visconsi*, 956 F.2d 560, 565 (6th Cir. 1992). When CommonPoint's motion to dismiss had been pending for about seven months, plaintiffs moved the district court to allow them to amend their complaint to add an additional Truth in Lending Act claim, and also to allow them to cure any defects in pleading which the district court found during its review of the pending motion to dismiss. The court held that neither delay nor prejudice would bar such amendment under the *Foman v. Davis* standard and the precedent of this Circuit. *See Foman v. Davis*, 371 U.S. 178 (1962). However, the court found that futility, one of the articulated *Foman v. Davis* grounds for restriction of the freely given right to amend the complaint, would in this case be grounds to deny amendment. The district court stressed that it was futility, and not undue delay or prejudice, which was the basis for its denial of the motion to amend.

Although the district court was not presented with an alternative enterprise theory, we do not believe that amendment of this complaint would have been futile, but rather that plaintiffs could have amended this complaint to allege a cognizable RICO enterprise. It is elementary that a corporation alone can serve as an enterprise for purposes of RICO, and pleading the RICO claim in this manner would eliminate the burden of proving that the entire secondary lending market was part of the enterprise at issue. *See* 18 U.S.C. § 1961(4) (1999) (defining an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.") In response to this panel's inquiry concerning why the plaintiffs did not simply allege