John H. **MRUZ**, Vasilike D. Nika, and Jane A. Johnson, Plaintiffs,

v.

**CARING, INC.,** Caring Residential Services, Inc., Caringhouse Projects, Inc., Caring Medical Day Services, Inc., Caring Fellowship Centers, Inc., Caring International, Inc., Comprehensive Eldercaring, Inc., Coastal Support Services, Inc., Ann J. Underland, Carlisle W. Underland, Garfield L. Greene, Lewis W. Field, Mary E. Haynie, Ian Meklinsky, Esq., and Fox, Rothschild, O'Brien & Frankel, Defendants.

No. Civ.A. 97–1468.

United States District Court, D. New Jersey.

Jan. 28, 1998.

Susan B. Pliner, Gary Green, Steven H. Griffiths, Sidkoff, Pincus & Green, Merchantville, NJ, for plaintiffs John H. Mruz, Vasilike D. Nika, and Jane A. Johnson.

Patrick G. Brady, Jed M. Milstein, Carpenter, Bennett & Morrissey, Newark, NJ, for defendants Caring, Inc., Caring Residential Services, Inc., CaringHouse Projects, Inc., Caring Medical Day Services, Inc., Caring Fellowship Centers, Inc., Caring International, Inc., Comprehensive ElderCaring, Inc., Coastal Support Services, Inc., Ann J. Underland, Carlisle W. Underland, Garfield L. Greene, Lewis W. Field, and Mary E. Haynie.

Paul A. Rowe, Alan S. Naar, Gary K. Wolinetz, Andrew M. Baer, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, Woodbridge, NJ, for defendants Ian Meklinsky, and Fox, Rothschild, O'Brien & Frankel.

## OPINION

ORLOFSKY, District Judge.

This action arises out of Plaintiffs' discovery and investigation of alleged Medicaid and tax fraud committed by some of the Defendants and the eventual termination of Plaintiffs' employment. Plaintiffs allege in their Complaint that Defendants, entities and individuals associated with CARING, Inc., and the law firm and one of its attorneys hired to represent CARING, Inc., terminated their employment in violation of the protections provided to "whistleblowers" under the Federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h). Plaintiffs also allege that some of the Defendants, including CARING, Inc.'s outside law firm, Fox, Rothschild, O'Brien & Frankel and Ian Meklinsky, Esq., an attorney associated with the firm, violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., by engaging in a campaign to retaliate for, and, through intimidation and harassment, to dissuade Plaintiffs from investigating and reporting the alleged Medicaid and tax fraud to law enforcement officials. Plaintiffs also allege that the retaliatory discharge was a violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. §§ 34:19–1 et seq. and, alternatively, a violation of the New Jersey Racketeer Influenced and Corrupt Organizations Act ("New Jersey RICO"), N.J.S.A. §§ 2C:41–1 et seq. Finally, Plaintiffs appear to allege a number of state law causes of action under New Jersey law, including, at least, defamation.

Defendants, CARING, Inc., CARING Residential Services, Inc., CARINGHouse Projects, Inc., CARING Medical Day Services, Inc., CARING Fellowship Centers, Inc., CARING International, Inc., Comprehensive ElderCARING, Inc., Coastal Support Services, Inc., Ann J. Underland, Carlisle W. Underland, Garfield L. Greene, Lewis W. Field, and Mary E. Haynie, and Defendants, Ian Meklinsky, Esq., and Fox,

Rothschild, O'Brien & Frankel, have now moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss certain counts of the Complaint. In ruling on the motions, the Court must determine: 1) who may be held liable for an unlawful discharge under the "whistleblower" provision of the Federal False Claims Act, 31 U.S.C. § 3730(h); 2) whether Plaintiffs have standing to maintain this action under 18 U.S.C. § 1964(c) of RICO; 3) whether Plaintiffs have adequately alleged a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5); 4) whether Plaintiffs have adequately alleged the participation in the operation or management of the RICO enterprise by the Attorney Defendants, Meklinsky and Fox, Rothschild; and 5) whether Plaintiffs have properly pled their state common law causes of action.[1] For the reasons set forth below, Defendants' motions will be granted in part and denied in part.

## I. Facts and Procedural History

Plaintiff, John H. Mruz ("Mruz"), served as Vice–President of Development and Administration on behalf of Defendants, CARINGHouse Projects, Inc. ("CARINGHouse") and Coastal Support Services, Inc. ("Coastal"), between June 12, 1995, and October 31, 1996. Plaintiffs' Complaint ¶ 1 (dated Mar. 21, 1997) (hereinafter Compl.). Between June 13, 1986, and October 31, 1996, Plaintiff, Jane A. Johnson ("Johnson"), served as Vice–President of Projects and Finance on behalf of CARINGHouse, CARING Fellowship Centers, Inc., ("CARING Fellowship"), CARING Medical Day Service ("CARING Medical"), and as Personnel Director on behalf of Defendants, CARING, Inc. ("CARING"), CARING Residential Services, Inc. ("CARING Residential"), CARINGHouse, CARING Medical, CARING Fellowship, CARING International, Inc. ("CARING International"), Comprehensive ElderCARING, Inc. ("Comprehensive"), and Coastal. Id. at ¶ 2.[2] Plaintiff, Vasilike D. Nika ("Nika"), served as Executive Assistant to the President of Coastal between March 13, 1995 and October 31, 1996. Id. at ¶ 3.

Defendant, Ann J. Underland ("Ann Underland"), is a member of one or more of the boards of trustees or directors of the CARING Corporations, and the person who chose board members. Id. at ¶ 20. Ann Underland allegedly "dominated and dictated the actions" of the CARING Corporations. Id.; see also id. at ¶¶ 21, 36(a). Defendant, Carlisle W. Underland ("Carlisle Underland"), is the son of Ann Underland and a member of one or more of the boards of the CARING Corporations, id. at ¶ 22, as are Defendants, Garfield L. Greene ("Greene"), Lewis W. Field ("Field"), and Mary E. Haynie ("Haynie"), id. at ¶¶ 24, 26, 28.[3]

The Complaint alleges that sometime in approximately March, 1996, Plaintiffs began to suspect that Ann Underland was conducting the affairs of the CARING Corporations so as to benefit her and some of the other CARING Individual Defendants personally. Id. at ¶ 36(a). Whatever this might mean, Plaintiffs also allege that Ann Underland and, it appears, the other CARING Individual Defendants, were causing the CARING Corporations to violate various, although unspecified, Federal and New Jersey laws. Id. at ¶ 36(b).

In particular, Plaintiffs allege that the CARING Corporations "appeared" to be receiving Medicaid funds substantially in excess of the amounts which should have properly been received, and that these surplus

---

1. No motion has been made by Defendants to dismiss Count III (CEPA).

2. The Complaint alleges that CARING is the "purported parent and dominating force over" CARING Residential, CARINGHouse, CARING Medical, CARING Fellowship, CARING International, Comprehensive, and Coastal. See Compl. at ¶¶ 4–5; see also id. at p. 5 ("Defendants identified below ... are held out to be subsidiaries of ... CARING ... and/or were ... each treated as an alter ego of CARING"). I refer to the corporate entities related to CARING collectively as

the "CARING Corporations" or the "CARING Corporate Defendants." All of the CARING Corporations are New Jersey non-profit corporations with their principal places of business in New Jersey and are, or "purport to be charitable [and] 'exempt organization[s]' [within the meaning of] the Internal Revenue Code." Compl. at ¶¶ 4, 6, 8, 10, 12, 14, 16, 18.

3. Ann Underland, Carlisle Underland, Greene, Field, and Haynie are referred to collectively in this Opinion as the "CARING Individual Defendants."

monies were being secretly diverted for the personal benefit of the CARING Individual Defendants. *Id.* at ¶ 37(a); *see also* id. at ¶ 37(d). Additionally, the CARING Corporations are alleged to have improperly accounted for money which was used to pay the personal expenses of Ann Underland, without the knowledge of members of the boards of the CARING Corporations. *Id.* at ¶ 37(b). Thus, Plaintiffs allege that the CARING Corporations, Ann Underland, and some or all of the other CARING Individual Defendants "engaged in activities that seemed to be federal tax fraud, failure to pay federal taxes, fraud in the receipt of federal Medicaid and other governmental funds, improper use of funds, and failure to properly spend funds." *Id.* at ¶ 37(f).

Eventually, Plaintiffs began to refuse to perform various aspects of their jobs which, without their knowledge, had been assisting the CARING Corporate and Individual Defendants in the alleged fraud. Plaintiffs also brought to the attention of Ann Underland and the members of the boards of the CARING Corporations the allegedly fraudulent conduct. *See id.* at ¶¶ 36(c), 38. Because of the allegedly hostile reactions of the CARING Individual Defendants to Plaintiffs' disclosures of misconduct, Plaintiffs contacted various governmental authorities, *see, e.g., id.* at ¶¶ 39–40, including the Federal Bureau of Investigation ("FBI") and the New Jersey Inspector General, and investigated whether there might be a basis for prosecuting a False Claims Act action. *Id.* at ¶¶ 40–41.

On September 24, 1996, Plaintiffs delivered a memorandum to Ann Underland which outlined many of their concerns and invited the CARING Corporations to initiate their own internal investigation and to institute corrective measures. *Id.* at ¶ 42; *see also id.* at Exh. A. It was at this point, Plaintiffs allege, that Ann Underland and the other CARING Individual Defendants commenced a "conspiracy, scheme, and campaign . . . that used the mail and the interstate wire . . . to retaliate against, harass, and intimidate Plaintiffs, as well as to punish Plaintiffs for being [whistleblowers] and for refusing to participate in said Defendants' schemes to violate the law." *Id.* at ¶ 44; *but see id.* at ¶ 48 (alleging that conspiracy to retaliate, harass, and intimidate began at a later moment). The actions constituting the "scheme," [4] as alleged, are, *inter alia:* 1) Ann Underland and Greene's isolation of Plaintiffs from other board members, *id.* at ¶¶ 45, 47; 2) in essence, preventing Plaintiffs from causing an investigation of the finances of the CARING Corporations to be conducted; and 3) deceiving the board members about the Plaintiffs and Plaintiffs' efforts to investigate the factual bases of their memorandum, *id.* at ¶¶ 44–47.

Several days after receipt of Plaintiffs' memorandum, CARING's board of directors delivered a memorandum to Plaintiffs which indicated, *inter alia:* 1) that a full investigation of the matters brought to their attention in the September 24, 1996, memorandum would occur; 2) that Greene would act on the board's behalf in all matters relating to the investigation; 3) that Defendant, Fox, Rothschild, O'Brien & Frankel ("Fox, Rothschild") had been hired to assist in the investigation; and 4) that Plaintiffs would be required to meet with Defendant, Ian Meklinsky, Esq. ("Meklinsky"), an attorney associated with Fox, Rothschild. *Id.* at ¶ 48; Exh. B.[5] The memorandum also imposed a number of restrictions upon Plaintiffs, including the restriction that Plaintiffs "remain off any [CARING] Organization premises unless directed otherwise by . . . Greene." *See id.,* at

---

**4.** I use the word "scheme" only where Plaintiffs employ it, taking seriously the Supreme Court's admonition that concepts which are not present in a statute should not be introduced into the analysis under RICO. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 240–41, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The RICO statute's language is difficult enough to interpret as written. *See, e.g., Tabas v. Tabas,* 47 F.3d 1280, 1290 (3d Cir.1995) ("if we examine the language of the statute itself, in an attempt to discern the scope of civil RICO, we find ourselves lost in a land with few signposts"). Of course, "elevating to the level of statutory text a phrase"—such as "continuity plus relationship"—may not be much different than introducing concepts not present in the statute into the analysis. *See H.J.,* 492 U.S. at 252 (Scalia, J., dissenting); *Swistock v. Jones,* 884 F.2d 755, 757 (3d Cir.1989).

**5.** I refer to Fox, Rothschild and Meklinsky collectively as the "Attorney Defendants."

¶ 49; Exh. B.[6] It was at this point, Plaintiffs allege, that Meklinsky and Fox, Rothschild joined in the conspiracy to "retaliate against, harass, and intimidate Plaintiffs," *id.* at ¶ 48, actions which the law firm "should have known" had as their ultimate goal the obstruction of justice and other improper behavior, *id.* at ¶ 54. Plaintiffs also allege that the memorandum circulated by CARING's board was used to "cause Plaintiffs to be defamed, maligned, portrayed as untrustworthy ... and to intimidate and threaten [them]." *Id.* at ¶ 49; *see also id.* at ¶ 55.

The alleged goals of the conspiracy to intimidate Plaintiffs were the obstruction of justice, interference with various investigations of the CARING Corporations, the intimidation of others with knowledge of the fraud, and the opportunity to "sanitize, destroy, and doctor evidence" of, presumably, the underlying Medicaid and tax fraud. *Id.* at ¶ 51. These efforts included: 1) intimidating telephone calls with a witness to the alleged Medicaid and tax fraud, *id.* at ¶¶ 56–58; 2) purported investigatory meetings with Meklinsky which were in reality efforts to intimidate Plaintiffs from acting as witnesses and efforts to learn details of the federal investigation of the CARING Corporations and the identities of those individuals who were cooperating with that investigation, *id.* at ¶ 61; 3) Fox, Rothschild's advice to CARING's board that Plaintiffs be fired, *id.* at ¶ 63, and, eventually, on October 31, 1996, Plaintiffs' firings, *id.* at ¶ 64.

The allegedly pretextual reasons for firing Plaintiffs were that Plaintiffs had failed to cooperate with the internal investigation being conducted by Fox, Rothschild on behalf of CARING's board and that Plaintiffs had absented themselves from work. *Id.* at ¶ 63. In reality, however, Plaintiffs allege, they were fired for pursuing a *qui tam* action, for being potential witnesses to the Medicaid and tax fraud, for cooperating with governmental investigations, for supporting others who were cooperating with those investigations, for refusing to participate in illegal behavior, and for the purpose of intimidating others into not cooperating with governmental investigations. *Id.* at ¶ 64; *see also id.* at ¶ 59.

On March 21, 1997, Plaintiffs filed this action. On the same day, Plaintiffs also filed what they have called a "Qui Tam Complaint," naming as defendants, all of the CARING Corporations and Ann Underland. *See Mruz, et al. v. CARING, Inc., et al.,* Qui Tam Complaint ¶¶ 4–20, Civil Action No. 97–1477(SMO) (dated Mar. 21, 1997) (hereinafter Qui Tam Compl.).[7] The *qui tam* Complaint alleges a cause of action under 31 U.S.C. § 3730(h), in a form substantially similar to the count alleged in the Complaint at hand. *Compare* Qui Tam Compl. at ¶¶ 46–55 with Compl. at ¶¶ 67–76. Plaintiffs also allege an entitlement to between 15 and 25 percent of the proceeds of the action or settlement of the claim, if the government proceeds with the action brought by the Plaintiffs, *i.e.,* the relators of the action, or between 25% and 30% of the proceeds of the action or settlement of the claim, if the government does not proceed with the action. Qui Tam Compl. at ¶ 56 and p. 23.[8] On October 20, 1997, the Government declined to intervene in the *qui*

---

6. Both memoranda are attached as exhibits to the Complaint. Where Plaintiffs attach and refer to these documents in the Complaint, the Court may consider them part of the pleadings for the purposes of a motion to dismiss for failure to state a claim under Rule 12(b)(6), without transforming the motion into a motion for summary judgment under Rule 56. *See, e.g., Pension Benefit Guaranty Corp. v. White Consolidated Indus., Inc.,* 998 F.2d 1192, 1196–97 (3d Cir.1993) (generally court may consider allegations in complaint, exhibits attached thereto, and matters of public record), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Brooks v. Blue Cross & Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1369 (11th Cir.1997).

7. *Qui tam* is derived from the Latin phrase *qui tam pro domino rege quam pro si ipso in hac*

*parte sequitur.* Thus, such an action is brought by someone "who sues on behalf of the King as well as for himself." *See* Black's Law Dictionary 1251 (6th ed.1990). Plaintiffs' False Claims action should be styled *United States ex rel. Mruz, et al. v. CARING, Inc., et al.,* since the action will be maintained by the relators in the name of the United States. *See generally* John T. Boese, *Civil False Claims and Qui Tam Actions* (1995 & Supp.1997).

8. While Mruz, Johnson, and Nika may be entitled to the percentage recoveries alleged in their *qui tam* Complaint, such an entitlement would arise, if at all, *only* out of their being able to, first, properly plead the elements required by sections 3729 and 3730 under the applicable pleading standard, *see, e.g., Gold v. Morrison–Knudsen Co.,*

*tam* action and on November 7, 1997, the Court, pursuant to 31 U.S.C. § 3730(b)(2), unsealed the *qui tam* Complaint and ordered that it be served on the Defendants. The *qui tam* Complaint was served on or about January 16, 1998.

The Court may exercise jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367.

## II. Standards on Motion to Dismiss

In considering a motion to dismiss under Rule 12(b)(6), the Court may dismiss the Complaint if it appears certain that the Plaintiffs cannot prove any set of facts in support of their claims which would entitle them to relief. *See, e.g., Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). While all well-pled allegations are accepted as true and all reasonable inferences are drawn in the Plaintiffs' favor, *see, e.g., Gomez v. Toledo,* 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990), the Court may dismiss the Complaint where, under any set of facts which could be shown to be consistent with a complaint, the Plaintiffs are not entitled to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct.

68 F.3d 1475, 1477 (2d Cir.1995) (noting proper pleading standard for claims under FCA), *cert. denied,* 517 U.S. 1213, 116 S.Ct. 1836, 134 L.Ed.2d 939 (1996); *United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1125 (E.D.Pa.1991) (same), and subsequently prove those elements. No recovery would stem from the fact that Plaintiffs have "brought crucial information to the attention of investigators and [have] continue[d] to provide investigators with valuable information regarding Defendants' violations of 31 U.S.C. § 3729." Qui Tam Compl. at ¶¶ 56–57; *see also id.* at ¶ 47. The notion that the provision of information to law enforcement officials regarding a false claim by itself entitles the person providing the information to some sort of bounty is a proposition of dubious validity.

The simultaneous maintenance of both the *qui tam* action and this civil action may also present some difficulties in light of 31 U.S.C. § 3730(b)(5). It provides: "When a person brings an action under this subsection [31 U.S.C. § 3730(b) ], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." Thus, to the extent Plaintiffs have alleged in their qui tam Complaint a cause of action

99, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Finally, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (noting that this procedure "streamlines litigation by dispensing with needless discovery and factfinding").

In spite of the fact that I must assume the truth of the facts alleged in the Complaint, it is nonetheless improper to assume that the Plaintiffs "can prove facts that it has [they have] not alleged or that the [D]efendants have violated ... laws in ways that have not been alleged." *Associated Gen'l Contractors of Calif. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Nor are legal conclusions made under the guise of factual allegations to be given the presumption of truthfulness. *See Casper v. Paine Webber Group, Inc.,* 787 F.Supp. 1480, 1490 (D.N.J.1992) (citing cases). With these basic principles in mind, I now turn to an analysis of Plaintiffs' claims.

## III. Discussion

Each set of Defendants, the CARING Individual Defendants, the CARING Individual

under 31 U.S.C. § 3730(b) (an "action for a violation of 31 U.S.C. § 3729"), a question which, given the inartfulness of the pleading in the *qui tam* Complaint, is not altogether easy to answer, under one possible interpretation of section 3730(b)(5), Plaintiffs may be forced to abandon one or more of their causes of action in one of the two actions. *See, e.g., United States ex rel. Dorsey v. Dr. Warren E. Smith Community Mental Health/Mental Retardation & Substance Abuse Ctr.,* 1997 WL 381761, *1–2 & n. 3 (E.D.Pa. June 25, 1997); 1986 U.S.C.C.A.N. at 5290 (noting that "private enforcement under the [FCA] is not meant to produce ... multiple separate suits based on identical facts and circumstances"). The reach and proper meaning of section 3730(b)(5) does not appear to have been conclusively determined by the federal courts.

Finally, the filing of a claim under section 3730(h) does not require that a plaintiff actually file a claim under section 3730(b). *See, e.g., id.* at *6; *see also Childree v. UAP/GA AG CHEM, Inc.,* 92 F.3d 1140 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1080, 137 L.Ed.2d 216 (1997); Boese, *Civil False Claims* at 4–134 n. 472 (citing cases which have "rejected requirement that a relator actually file a suit to be protected" by section 3730(h)).

Defendants, and the Attorney Defendants, has now moved to dismiss certain of the causes of action asserted by Plaintiffs. I review their arguments with respect to each cause of action *seriatim*.

## A. Whistleblower Provision of the FCA (Count I)

Plaintiffs state their first cause of action against all of the Defendants under section 31 U.S.C. § 3730(h). They allege that they acted as whistleblowers and were furthering a False Claims action, to be brought by them or the federal government, and that they were retaliated against because of the lawful acts performed by them in furtherance of a False Claims action.

The Attorney Defendants have argued that section 3730(h) is limited to suits against employers and that the Complaint does not allege any employment relationship between Plaintiffs and the Attorney Defendants. They argue that the word "employer" should be construed to embrace the common law master-servant relationship, and that Plaintiffs have not alleged any fact which would suggest such a relationship between Plaintiffs and the Attorney Defendants. *See* Brief on Behalf of Attorney Defendants at 5–9 (dated June 10, 1997) (hereinafter Attorney Defendants' Brief). Using substantially the same arguments, *see* Brief of CARING Corporate and CARING Individual Defendants at 1 n. 1 (dated June 11, 1997) (hereinafter CARING Defendants' Brief), and with virtually identical language, the CARING Individual Defendants, *i.e.*, Ann Underland, Carlisle Underland, Greene, Field, and Haynie, argue that Plaintiffs have not alleged that they were ever employed by the CARING Individual Defendants. *See* CARING Defendants' Brief at 8–11. Thus, the CARING Individual Defendants argue, they cannot be liable under 31 U.S.C. § 3730(h).

In response, Plaintiffs contend that those who are not actually employers can and should be liable under section 3730(h) because to hold otherwise would be to create an unwarranted "immunity" for those who are not employers, but who nonetheless participate in activity prohibited by the statute. This "immunity," Plaintiffs argue somewhat tautologically, is unwarranted because those who conspire to injure a whistleblower in his or her job should be liable to the same extent and in the same way as the actual employer, as should the employer's agents. *See* Plaintiffs' Combined Briefs in Opposition to Motions to Dismiss at 19 (dated July 21, 1997) (hereinafter Plaintiffs' Brief).

■ For the reasons set forth below, I conclude that Plaintiffs' "grasp" of "whistleblower" liability exceeds the reach of section 3730(h) of the FCA. Accordingly, Plaintiffs' claim under section 3730(h) of the FCA as against the Attorney Defendants and Carlisle Underland, Greene, Field, and Haynie will be dismissed.

I begin my analysis where all questions of statutory interpretation begin, the plain language of the statute. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). Section 3730(h) provides:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h); *see generally* Boese, *Civil False Claims* at 4–133 to 4–142 (discussing basic elements of cause of action under section 3730(h); David P. Westman, *Whistleblowing: The Law of Retaliatory*

*Discharge* 123–24 (1991)). Everything about the plain language of section 3730(h) reflects a legislative intent to operate exclusively in the area of the "employment relationship." The statute extends to specified actions taken "by [the plaintiff's] employer."[9] The statute prohibits actions which might be taken with respect to a plaintiff's conditions of employment, *e.g.*, being discharged, demoted, suspended, or "in any other manner discriminated against in the terms and conditions of employment." Also, the primary relief mentioned in the statute can logically be granted only by someone who has or had an employment relationship with a section 3730(h) plaintiff, *i.e.*, relief is likely to consist of reinstatement or the payment of back wages or interest thereon.

Finally, given the language of section 3729, a closely related statute which provides for a cause of action for false claims against the federal government, it is quite clear that had Congress intended to provide a remedy against those who aid and abet, or conspire to discharge, demote, suspend, or discriminate against their employees, it certainly knew how to do so. *See, e.g.*, 31 U.S.C, § 3729(a)(3) (imposing liability on "any person who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid"); *see also id.* at § 3729(a)(1) (imposing liability on "any person who knowingly presents, or causes to be presented to ... the United States Government ... a false or fraudulent claim for payment or approval"); *cf. Behrens v. Rutgers Univ.*, 1996 WL 570989, *6 (D.N.J. Mar.29, 1996).

Absent explicit statutory language, the Court sees no reason why "whistleblower" liability should be extended in the wholesale and unprecedented fashion advocated by the Plaintiffs. *Cf. Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 1451, 128 L.Ed.2d 119 (1994) (no precedent for proposition that aiding and abetting liability should attach to all federal statutes absent aiding and abetting provision). Thus, liability under section 3730(h) cannot be extended on the basis of a conspiracy; the hallmark of liability under section 3730(h) is an "employment relation-

ship" and for this, the Court must search. *See, e.g., Clemes v. Del Norte Cty. United School Dist.*, 1996 WL 331096, *7 n. 6 (N.D.Cal.1996) (finding that plaintiff could not name individuals as defendants in section 3730(h) action because school district, *not school officials*, were employers); *Shapiro v. Sutherland*, 835 F.Supp. 836, 837–38 (E.D.Pa.1993) (question of fact existed as to whether plaintiff was employee under common law agency test); *Hardin v. DuPont Scandinavia (ARA–JET)*, 731 F.Supp. 1202, 1205 (S.D.N.Y.1990) (independent contractor failed to state claim under 3730(h)); *see also United States ex rel. Lamar v. Burke*, 894 F.Supp. 1345, 1347–48 (E.D.Mo.1995) (applying Title VII definition of employer and finding that "employer" as used in section 3730(h) does not extend to corporate supervisors or president of defendant). This approach is faithful to both the language of the statute, the general proposition that remedial statutes be liberally construed, and Congress' intent that the "definitions of 'employee' and 'employer' ... be all inclusive." S.Rep. No 99–345, at 34–35 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299–5300.

The principal case upon which Plaintiffs rely for the proposition they advance—that the co-conspirators of a plaintiff's employer, who are not themselves the plaintiff's employer, may be liable under section 3730(h)—does not extend as far as Plaintiffs "reach." In *United States ex rel. Kent v. Aiello*, 836 F.Supp. 720 (E.D.Cal.1993), the plaintiff's first employer turned over the management of an enterprise to a second, closely-related corporate entity, which assumed the employment contract. *Id.* at 722. The plaintiffs in *Kent* sued both the first and second employers under section 3730(h). The question addressed by *Kent* was whether only a *current* employer could be sued under section 3730(h), or whether an immediate *past* employer who had engaged in proscribed conduct could also be sued. *Id.* at 724. The *Kent* court, influenced by Ninth Circuit precedent holding that past employers could be sued for interfering with a plaintiff's later employment under Title VII, *id.* at 726, found that both employers could be sued. However, the *Kent* court carefully noted that the plaintiff had had an employment relationship with *both* defendants. Also, the *Kent*

---

**9.** The term "employer" is not defined within the statute.

court simply never went so far as to hold that those who *never* had an employment relationship with the actual employer could be sued under the statute, let alone hold that mere conspiracy with an employer could subject someone to liability under section 3730(h). *Id.* at 725–26. In short, the one case affirmatively cited by Plaintiffs does not support their position with any logical force.

On a more fundamental level, Plaintiffs' argument about the reach of the statute misstates the question. It is true that from some perspective, every statute which proscribes specifically defined conduct creates "immunity" in that the statute reaches only those who fall within its language. Nonetheless, to conceive of the conduct beyond the scope of section 3730(h) as "immunized" obscures more than it reveals. Immunity, for example, qualified or sovereign immunity, is normally a defense which must be asserted and proven by a defendant or which may be waived. *See, e.g., Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 239–41, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Here, however, the burden is not on the Attorney Defendants and the CARING Individual Defendants to show why they are not entitled to "immunity" under the statute. Rather the burden is on the Plaintiffs to plead sufficient facts in their Complaint so as to state a cause of action against these specific Defendants under section 3730(h) and, eventually, to prove those facts at trial.

■ Turning now to the Complaint, I must determine whether Plaintiffs have pled facts from which an inference of an employment relationship between Plaintiffs and the Attorney Defendants or between Plaintiffs and the CARING Individual Defendants can be drawn.[10] A review of the Complaint confirms that no such inference can reasonably be drawn. First and perhaps most important, Plaintiffs allege that they were employed by various corporate entities, not by the Attorney Defendants or the CARING Individual Defendants. *See* Compl. at ¶¶ 1–3. Plaintiffs have alleged that the CARING Individual Defendants defined and supervised Plaintiffs' job assignments, not that they were Plaintiffs' employers. *See* Compl. at ¶¶ 36(c), 49, 61(a). As to the Attorney Defendants, there is nothing in the Complaint suggesting an employment relationship between the Attorney Defendants and Plaintiffs. However, with respect to Ann Underland, there is a factual question whether she was Plaintiffs' *de facto* employer as she is alleged to have dominated and dictated the actions of the CARING Corporations and their boards, and to have been conducting the affairs of the CARING Corporations in a way which benefitted her, *inter alia,* personally. *See id.* at ¶¶ 20, 36(a). Given the facts as alleged in the Complaint, it cannot be said that Plaintiffs cannot prove that Ann Underland was, in fact, their employer. Therefore, Count I of the Complaint will be dismissed with prejudice only as to Meklinsky, Fox, Rothschild, Carlisle Underland, Greene, Field, and Haynie.

### B. RICO (Count II) and New Jersey RICO (Count IV)

Count II of the Complaint alleges a cause of action against Defendants, CARING, Inc., Ann Underland, Carlisle Underland, Greene, Field, and Haynie, and the Attorney Defendants (collectively, the "RICO Defendants") under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.,* specifically 18 U.S.C. § 1962(c)[11] and (d).[12]

---

**10.** I do this in light of the general proposition that a complaint should be read in a light favorable to the pleader, despite the fact that not even Plaintiffs have argued that the Complaint supports the inference of an employment relationship between themselves and either the CARING Individual Defendants or the Attorney Defendants. Rather, Plaintiffs place all their faith on their assertions of "reciprocal agency relationships" or that these parties were "aiders and abettors and co-conspirators" of their employers. Plaintiffs' Brief at 21. I have already explained why this faith is at root misguided.

**11.** "Section 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

**12.** Section 1962(d) provides that:

They allege that the "enterprise," within the meaning of section 1961(4,) consists of the CARING Corporations, with the exception of CARING, Inc. *See* Compl. at ¶ 79. They allege further that the RICO Defendants conducted and/or participated in the conduct of the affairs of the enterprise through a pattern of racketeering, specifically repeated acts of mail fraud, within the meaning of 18 U.S.C. § 1341, wire fraud, within the meaning of 18 U.S.C. § 1343, obstruction of a criminal investigation by means of bribery, within the meaning of 18 U.S.C. § 1510, witness tampering, within the meaning of 18 U.S.C. § 1512(b)(1), (b)(3), and (c)(2), and retaliation against a witness, within the meaning of 18 U.S.C. § 1513(a)(1–2). Compl. at ¶¶ 78, 82, 84–85.[13] They also allege that the RICO Defendants conspired to violate section 1962(c), in violation of 18 U.S.C. § 1962(d). *Id.* at ¶¶ 83–85. The Attorney Defendants, and CARING, Inc. and the CARING Individual Defendants have moved to dismiss the RICO count under various grounds.

### 1. Standing

Defendants argue first that Plaintiffs lack standing to sue under the Federal and New Jersey RICO statutes, citing as authority a line of cases which stand for the proposition that a plaintiff's injury under 18 U.S.C. § 1964(c), *i.e.*, the injury "in [the plaintiff's] business or property" in this case, discharge from employment, must be the result of a violation of section 1962. With enough blunderbuss and invective so as to border on the uncivil,[14] Plaintiffs respond that the retaliatory discharge alleged was the result of predicate acts which form, at least, part of a pattern of racketeering, within the meaning of 18 U.S.C. § 1961(5), and, therefore, Plaintiffs have standing to maintain this action because they were injured by the predicate acts.

While framed as a question of "standing" under RICO, what Plaintiffs and the RICO Defendants essentially dispute is the injury and causation elements of RICO which are embodied in the statutory language. A private right of action for violations of section 1962 stems from 18 U.S.C. § 1964(c) which provides, in relevant part:

> Any person injured *in his business or property by reason of a violation of section 1962* of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c) (emphasis added). Thus, the questions the Court must answer are: 1) Were the Plaintiffs injured "in [their] business or property"?; and 2) Did that injury occur "by reason of a violation of section 1962"?[15]

■ As to the first question, the parties do not appear to dispute that a loss of one's job—the injury alleged by Plaintiffs—is injury to one's business or property. Nor could they, as courts have generally viewed the loss of one's job as an injury to one's business or property. *See, e.g., Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1170 (3d Cir.1989) (loss of earnings, benefits, and reputation were sufficient injuries to state claim

---

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(d).

**13.** Plaintiffs have now disclaimed 18 U.S.C. § 1510 as a predicate act and indicate their intention to rely on 18 U.S.C. §§ 1512(b)(3) and 1513(a)(2). *See* Plaintiffs' Brief at 23, 24 n. 15, 26.

**14.** *See, e.g.*, Plaintiffs' Brief at 29 (suggesting that Defendants are not "brave enough to frame the issue properly"), 30 (suggesting that Defendants do not "want[ ] to engage in a meaningful discussion of standing"), 31 (characterizing Defendants' arguments as "a baffling dissertation on a host of irrelevant cases"). I need not go on.

**15.** Of course, a conventional question of standing has both injury and causation elements, in addition to a redressability element. *See generally* Erwin Chemerinsky, *Federal Jurisdiction* 57–81 (2d ed.1994). The point here is only to stress that the requirements for, and tests to determine standing in a RICO case derive from the statutory language itself.

under section 1962(d)); 2 Arthur F. Mathews, Andrew B. Weissman & John H. Sturc, *Civil RICO Litigation* § 8.04[C][3][a] at 8–75 to 8–76 (2d ed.1992).

■ As to the second question, the parties do, however, dispute the nature of the source of Plaintiffs' injury. In the seminal case of *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court clarified exactly what the source of injury had to be in order for a plaintiff to maintain an action. The Sedima Court held, first, that there is no requirement that a plaintiff establish a "racketeering injury" in order to maintain a cause of action under section 1962(c). *Id.* at 495. Rather, "the compensable injury necessarily is the harm caused by the predicate acts sufficiently related to constitute a pattern." *Id.* at 497 (emphasis added). Second, clarifying which persons may maintain an action and what such persons may recover, the Court held that "the plaintiff only has standing if, and can recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Id.* at 496. This "requirement ... limits the availability of RICO's civil remedies to those who have suffered *injury in fact.*" *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 279–80, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring) (emphasis added); *Khurana v. Innovative Health Care Sys., Inc.*, 130 F.3d 143, 147–49 (5th Cir.1997); *Schiffels v. Kemper Fin. Serv., Inc.*, 978 F.2d 344, 351 (7th Cir.1992) (discussing RICO standing under *Sedima*, and proximate cause under *Holmes*).

In support of their argument that Plaintiffs have no standing, the RICO Defendants cite the numerous cases which hold that a plaintiff may not sue under RICO where the plaintiff has been terminated for "blowing the whistle" on an employer's racketeering or for the plaintiff's failure to cooperate with that racketeering. *See, e.g.,* CARING Defendants' Brief at 12–15; Attorney Defendants' Brief at 11–13. *See, e.g., Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285 (3d

Cir.1996); *Shearin v. E.F. Hutton Group*, 885 F.2d 1162 (3d Cir.1989); *Dooley v. United Tech. Corp.*, 1992 WL 167053, *4 (D.D.C. June 17, 1992); *Casper v. Paine Webber Group*, 787 F.Supp. 1480 (D.N.J.1992). Those cases rely upon the very sensible holding that, under the facts as alleged, the termination was not the result of a RICO violation.

The RICO Defendants, however, do not embrace the substantial authority which distinguishes those cases from the situations where plaintiffs alleged that the conduct constituting the retaliation, harassment, or intimidation, and which ultimately culminated in the discharge, is *itself* racketeering activity.[16] *See, e.g., Dooley*, 1992 WL 167053, *4–5 & n. 3 (noting exception to no standing rule where a discharged employee shows that adverse employment decision constituting injury to business or property "was proximately caused by racketeering activity," for example, obstruction of justice or witness tampering); *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 47 & n. 8 (1st Cir.1991) (discussing *Nodine v. Textron, Inc.*, 819 F.2d 347 (1st Cir. 1987)); *Pujol v. Shearson/American Express, Inc.*, 829 F.2d 1201, 1205 (1st Cir. 1987). Additionally, the RICO Defendants misread the line of precedent they do cite. Courts have not held that wrongful terminations are somehow a different kind of injury, rather they have simply held that, *under the facts as alleged in those cases*, the termination was not the result of a RICO violation. *See, e.g., Bowman v. Western Auto Supply Co.*, 985 F.2d 383 (8th Cir.1993), *cert. denied*, 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993); *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 155–56 (6th Cir.1990) (noting that plaintiff failed to plead facts showing injury result from RICO predicate acts, including violation of 18 U.S.C. § 1503). It cannot be that those who conduct an enterprise's affairs by engaging in a pattern of racketeering activity which ultimately causes an employee's termination can escape liability under RICO. There does not appear to be caselaw which carves out one parcel of poten-

**16.** This is not to suggest that Plaintiffs cited these cases either, even if Plaintiffs' argument echoes their reasoning.

tial injuries—employment related ones—for treatment substantially different than other injuries to a plaintiff's business or property; the fact that racketeering activity under RICO results in job loss does not transmogrify the racketeering into something else.[17] *Rehkop,* relied upon substantially by the RICO Defendants, does not so hold and the Court is unaware of cases which do.[18]

The RICO Defendants do not appear to dispute that Plaintiffs have standing to maintain a cause of action for a RICO conspiracy under 18 U.S.C. § 1962(d). *See* CARING Defendants' Brief at 2 n. 3, 16 n. 11; Plaintiffs' Brief at 21–23 & n. 12. At least the CARING Corporate Defendants named in the RICO count recognize that "predicate acts for conspiracy do not of necessity consist of section 1961(1) racketeering activity .... [and that a]cts that further a 1962(d) conspiracy thus may cause harm even when they do not themselves qualify as racketeering activity." *See Shearin,* 885 F.2d at 1169. The holding of *Shearin* is not without its critics, both within and without the Third Circuit. *See Rehkop,* 95 F.3d at 290; *Schiffels,* 978 F.2d at 348–49.[19]

Turning to the Plaintiffs' allegations, I must determine whether the Complaint alleges predicate acts which caused their termination. I conclude that Plaintiffs have made such an allegation, *see, e.g.,* Compl. at ¶ 85, although Plaintiffs cannot, without amending their Complaint, rely upon a number of statutes upon which they appear to rely.

At the outset, it should be noted that Plaintiffs do not allege that they were injured in their business or property by the underlying Medicaid and tax fraud, or, at least part, if not all of the scheme to cover up the Medicaid and tax fraud, acts which they allege constituted mail and wire fraud. *See* Compl. at ¶ 84; Plaintiffs' Brief at 37. Rather, Plaintiffs allege that they were injured by violations of 18 U.S.C. § 1512(b)(1), (b)(3), and (c)(2), and 18 U.S.C. § 1513(a)(1–2). *See* Compl. at ¶ 85; *but see* Plaintiffs' Brief at 26, 30, 32 (noting that Plaintiffs allege enough to demonstrate violations of 18 U.S.C. §§ 1512(b)(3) and 1513(a)(2)).[20]

■ Regardless of which subsections of 18 U.S.C. § 1513 Plaintiffs intend to use, on the facts as alleged in the Complaint, no violation of 18 U.S.C. § 1513 is alleged. That section provides, in relevant part:

**17.** That said, it is equally true that gratuitous allegations of racketeering activity resulting in job loss will not suffice to turn a retaliatory discharge case into a RICO case. Nor is it the case that racketeering activities which result in job loss and other racketeering activities are necessarily continuous and related so as to be embraced by the same "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), as explicated by *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). I discuss the relationship between the Medicaid and tax fraud and the retaliation and harassment below. *See* III.B.2, *infra.*

**18.** The RICO Defendants read *Rehkop* as saying that the plaintiff in that case alleged that the conspiracy to conceal an underlying mail fraud and to impeach the plaintiff's credibility were predicate acts of racketeering. *See, e.g.,* CARING Defendants' Reply Brief at 12–14. It is not altogether clear, however, that the *Rehkop* court believed this to be the case. *See Rehkop,* 95 F.3d at 288–289, 290 n. 7. Had the *Rehkop* court considered this to be so, then that panel need not have resorted to the rule enunciated in *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162 (3d Cir. 1989), that acts which are in furtherance of a RICO conspiracy and which harm a plaintiff, for

example, a plan to retaliate, but which do not constitute RICO predicate acts, may nonetheless form the basis of a claim under section 1962(d).

**19.** Although not a standing case, The Supreme Court's recent decision in *Salinas v. United States,* ⸺ U.S. ⸺, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), which held that a conspiracy in violation of section 1962(d) may exist even if the conspirator does not agree to commit the underlying predicate acts, as long as the conspirator adopts the goal of furthering or facilitating the criminal endeavor, *id.* at ⸺, 118 S.Ct. at 477, may signal a further disconnect between subsection (a–c) and subsection (d) of section 1962 and may suggest *Shearin* 's survival.

**20.** Of course, that Plaintiffs were not injured by all of the predicate acts of racketeering, for example, the Medicaid and tax fraud, does not mean that they do not have standing to allege a violation of RICO under section 1961(c), as long as at least one of the predicate acts resulted in their injury. *See, e.g., Giuliano v. Everything Yogurt, Inc.,* 819 F.Supp. 240, 243 n. 3 (E.D.N.Y. 1993) (citing, *inter alia, Town of Kearny v. Hudson Meadows Urban Renewal Corp.,* 829 F.2d 1263, 1268 (3d Cir.1987)). I discuss below whether Plaintiffs were injured by a predicate act of racketeering.

(a)(1) Whoever *kills or attempts to kill* another person with intent to retaliate against any person for—

> (A) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or

> (B) providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings, shall be punished as provided in paragraph (2).

(2) The punishment for an offense under this subsection is—

> (A) in the case of a killing, the punishment provided in sections 1111 and 1112; and

> (B) in the case of an attempt, imprisonment for not more than 20 years.

(b) Whoever *knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so,* with intent to retaliate against any person for—

> (1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or

> (2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings given by a person to a law enforcement officer; or attempts to do so; shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 1513 (emphasis added). Plaintiffs allege no killing, intent to kill, bodily injury, damage to tangible property, or threats to cause bodily injury or to damage tangible property. At most, Plaintiffs allege that they were threatened with adverse employment actions, clearly not a threat to tangible property. *See, e.g.,* Compl. at ¶ 61(a).

■ Plaintiffs do, however, adequately allege a violation of 18 U.S.C. § 1512(b) and perhaps subsection (c). They provide:

(b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

> (1) influence, delay, or prevent the testimony of any person in an official proceeding;

> (2) cause or induce any person to—

> (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

> > (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

> > (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

> > (D) be absent from an official proceeding to which such person has been summoned by legal process; or

> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than ten years, or both.

(c) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

> (1) attending or testifying in an official proceeding;

> (2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding; or attempts to do so, shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 1512(b–c).[21]  Clearly, Plaintiffs have alleged a violation of section 1512, and therefore, Plaintiffs do have standing to maintain a RICO action under section 1962(c) and, as I have already pointed out, section 1962(d).

### 2. Pattern of Racketeering Activity

In order to state a cause of action under section 1962(c), Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496; *see generally* Jed S. Rakoff & Howard W. Goldstein, *RICO: Civil & Criminal, Law & Strategy* §§ 1.02, 2.01[2] (1989 & Supp.1995). The RICO Defendants have attacked the Complaint as failing to allege a pattern of racketeering activity within the meaning of section 1961(5).[22]

The statutory definition of "pattern of racketeering activity" is not particularly helpful in setting the boundaries of a RICO case since section 1961(5) simply "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). In *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court noted that the statutory definition "does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern." *Id.* at 237. Be-

yond the minimum two predicate acts, the Court also noted that mere numerosity of predicate acts does not a pattern make. *See id.* at 238 (noting that it is "the relationship that they bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged' ").

When it had finished saying what a pattern of racketeering activity was not and after reviewing the statute's legislative history, the Court finally held that "pattern" has two elements: "continuity plus relationship," constituents which will often overlap. *Id.* at 239 (citations omitted). By "relatedness," the Court meant that the acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240; *see, e.g., Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 609 (3d Cir.1991), *cert. denied*, 504 U.S. 955, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992).

By "continuous," the Court meant "a temporal concept … both closed- and open-ended … referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 609 (quoting *H.J.*). Continuity may thus be proven in two ways: either by showing closed-ended continuity, *i.e.*, "proving a series of related predicates extending over a substantial period of time," *H.J.*, 492 U.S. at 242, or by showing open-ended continuity, *i.e.*, a series of related predicates extending over a shorter period of time, but which poses "a distinct threat of long-term racketeering activity, either implicit or explicit," *id.* As examples of the later, the Court offered the paradigmatic "hoodlum" selling " 'insurance' to a neighborhood's storekeepers to cover them against breakage of their windows," *id.*, or a case where "the predicate acts or offenses are part of an ongoing entity's regular way of

---

**21.** The minor amendments to 18 U.S.C. §§ 1512, 1513 which occurred on October 1, 1996, *i.e.*, during the alleged pattern of racketeering activity, are not relevant to determining whether Plaintiffs have adequately alleged violations of those sections. *See* 110 Stat. 3017, *reprinted in*, 1996 U.S.C.C.A.N. 3401 *et seq.*

**22.** The CARING Defendants and the Attorney Defendants do not, at this point, claim that Plaintiffs have failed to state a claim for a violation of 18 U.S.C. § 1961(d). *See* CARING Defendants' Brief at 16 n. 11; Attorney Defendants' Brief at 10.

doing business," including a "legitimate" business' mode of operation. *Id.* at 242–43.

Although decided before *H.J.*, courts in the Third Circuit have been using the factors set forth in *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir. 1987) (outlining factors, number of unlawful acts, length of time over which acts were committed, similarity of acts, number of victims, number of perpetrators, and character of unlawful activity), as an analytical tool to discern whether a series of predicate acts met the continuity requirement. However, even before the Third Circuit's *en banc* decision in *Tabas*, the decisions of this Circuit, taken together, expressed ambivalence about the utility of the *Barticheck* factors. *See, e.g.,* 1 *Civil RICO Litigation* § 4.03[E][2][b][iii] at 4–114 (noting history of multi-factored analysis in light of *H.J.* within courts of Third Circuit). *Tabas* unfortunately was not particularly helpful in clarifying the state of the law of this Circuit, only in sharpening the debate regarding the *Barticheck* factors. *Compare Tabas*, 47 F.3d at 1296 (noting that, although court did not employ *Barticheck* factors, this "does not ... mean that they might not be relevant in a different case in determining if continuity exists") (Roth, J.) with *id.* at 1298–1300 (noting that "although the duration of the predicate acts does not without more show continuity, if the acts occurred (as shown by the number of acts) or establish a threat of occurring (as shown by also considering whether they are repetitive in nature) with some frequency, they satisfy the continuity requirement," regardless of similarity of acts, number of victims, and number of perpetrators) (Becker, J., concurring in part) with *id.* at 1302 (noting that *Barticheck* factors should be considered only "to the extent they have some logical bearing on 'relatedness' or

'continuity' ") (Alito, J., concurring) with *id.* at 1305–07 (applying *Barticheck* factors "as they bear upon ... continuity and relatedness") (Greenberg, J., dissenting); *see also Hindes v. Castle*, 937 F.2d 868, (3d Cir.1991) (discussing utility of *Barticheck* factors in light of *H.J.*); *Leonard A. Feinberg, Inc. v. Central Asia Capital Corp., Ltd.*, 974 F.Supp. 822, 848 n. 12 (E.D.Pa.1997); 1 *Civil RICO Litigation* § 4.03[D] at 4–55 (noting that *H.J.* court did not mention victim-oriented factors in describing pattern requirement).

■ That said, and taking seriously the language in Judge Becker's compelling concurring opinion which observed that the "continuity prong of pattern analysis should be explicitly directed toward ruling out RICO liability premised on two or more predicate acts that are related, but nonetheless 'isolated' or 'sporadic'," *id.* at 1299 (Becker, J., concurring),[23] I must look to the Complaint to determine whether Plaintiffs allege both the continuity and relatedness of the predicate acts.[24]

■ Reduced to its essence, *see* n. 13 & III.B.2, *supra*, Plaintiffs allege the repeated commission of acts of mail fraud, wire fraud, and witness tampering. Compl. at ¶ 82. The Complaint alleges that predicate acts of racketeering began on September 24, 1996. *Id.* at ¶ 84(a) ("Defendants ... embarked upon a scheme to defraud"); *see also id.* at ¶ 86(a). The Complaint alleges further that Defendants utilized the mail and wires to communicate misrepresentations about Plaintiffs with the purpose and result of "defraud[ing the independent board members of the CARING Corporations] out of their votes, and instead to unknowingly vote to fire Plaintiffs for pretextual reasons ... thus facilitating said Defendants overall scheme: to cover up [Medicaid and tax fraud], retaliate

**23.** This is particularly true on a motion to dismiss.

**24.** While on their surface, the RICO Defendants have only attacked the Complaint on the basis of the "continuity" prong, it is clear that in describing the predicate acts, the RICO Defendants implicitly challenge the "relatedness" of the predicate acts. *See, e.g.,* CARING Defendants' Brief at 15 (noting that "Defendants read [P]laintiffs' Complaint to allege that there were two

'schemes' "); Attorney Defendants' Brief at 17. The highly fact-sensitive nature of the "continuity" and "relatedness" inquiries and the fuzziness of those concepts mean that one's reading of a complaint can overdetermine whether "continuity" and "relatedness" have been properly alleged. I counter this tendency by underscoring the Court's duty on a Rule 12(b)(6) motion to read a complaint liberally and to draw all reasonable inferences in favor of the pleader.

against Plaintiffs ...; and defame Plaintiffs." *Id.* at ¶ 84(b–c). The cover-up efforts are alleged to be "separate" from the "scheme to defraud which involved [the RICO Defendants, but not the Attorney Defendants], and which occurred during 1995 and 1996." *Id.* at ¶ 84(d); *see also id.* at ¶¶ 84(d)(1–7) (describing Medicaid and tax fraud). The cover-up efforts are also alleged to involve acts of witness tampering designed to "harass, defame, and retaliate against Plaintiffs, as well as employees and independent board members, and in so doing, made use of intimidation, threats, corrupt actions, and misleading conduct towards other people to, or in an attempt to, influence, delay, and/or prevent the testimony of the Plaintiffs in the grand jury [investigating the Medicaid and tax fraud." *Id.* at ¶ 85(a); *see also id.* at ¶¶ 85(b–c).

In response to Defendants' motion attacking the allegations of a pattern of racketeering activity and in an attempt to show that they have alleged a closed-ended pattern of racketeering activity lasting over a year, *see Tabas,* 47 F.3d at 1293 (noting that closed-ended continuity embraces patterns of racketeering activity which last longer than one year), Plaintiffs argue that the Complaint first described a scenario in which certain Defendants committed repeated acts of mail and wire fraud and operated a "Medicare [sic] and tax fraud scheme." Plaintiffs' Brief at 36. "The Complaint then described how it became necessary to enlarge the scope of the pattern when Defendants learned that Plaintiffs had discovered their crimes and were cooperating with the FBI. Defendants were thus alleged to have enlarged the pattern by adding new perpetrators [the Attorney Defendants]." *Id.* at 36; *see also id.* at 30 (arguing that pattern of Medicaid and tax fraud was "*engrafted onto* the pattern (along with new co-conspirators/actors Fox and Meklinsky) to protect the original Medicaid and tax fraud scheme") (emphasis added).

While the Complaint may be amenable to this reading, that is, cover-ups may be sufficiently related to the underlying offense such that they form part of the same pattern of racketeering activity, *see, e.g., Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1021–22 (7th Cir.1992) (noting that cover-up activities can serve as predicate acts); *United States v. Moscony,* 927 F.2d 742, 755 (3d Cir.1991), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991); *Jones v. Lampe,* 845 F.2d 755, 759 (7th Cir.1988); *but see Davis v. Grusemeyer,* 996 F.2d 617, 626–27 (3d Cir.1993); 1 *Civil RICO Litigation* § 4.03[E][21][a][i] at 4–92 to 4–93 & n. 227 (noting that courts generally reject approach that includes cover-up as part of time-period for pattern requirement and citing numerous cases), such a reading would require ignoring several elements of the Complaint and the drawing of inferences which are not reasonable, given the facts as pled.

First, one would have to ignore the fact that three times Plaintiffs allege that the racketeering activity, or the conspiracy in furtherance thereof, began on September 24, 1996. *See* Compl. at ¶¶ 84(a), 86(a), 87. Second, one would have to ignore the fact that even Plaintiffs allege that the racketeering activity constituting the cover-up and the racketeering activity constituting the underlying Medicaid and tax fraud are, to some unspecified extent and in some unspecified way, "separate." *Id.* at 84(d). Third, the Complaint alleges that the victims of the pattern of racketeering activity are current and former employees and board members, but does not mention those who were victimized by the Medicaid and tax fraud, for example, the taxpayers of the United States or the United States itself. *See id.* at ¶ 87(e).

Fourth, the Complaint alleges that the conspiracy to commit all of the violations of RICO alleged includes all of the RICO Defendants, the strong implication being that the conspiracy in furtherance of the racketeering activity does not include conspiracy in furtherance of the Medicaid and tax fraud, because, as Plaintiffs recognize, *see id.* at ¶ 84(d), the Attorney Defendants did not participate in this conduct. Thus, it appears, at best, that the Complaint is fundamentally equivocal on the issue of whether the Medicaid and tax fraud are part of the pattern of racketeering activity and, accordingly, whether the time-period alleged by Plaintiffs is long enough to satisfy the continuity prong of the *H.J.* test. In short, the disjointed,

confusing, and contradictory nature of the Complaint's RICO Count, insofar as it alleges closed-ended continuity, shows that Plaintiffs cannot proceed on this theory with the Complaint they have filed. Because the Complaint, as pled, does not satisfy the continuity prong of the pattern requirement, insofar as it alleges closed-ended continuity, Plaintiffs may not proceed on this theory.[25]

■ As a fallback, however, Plaintiffs claim that they have alleged open-ended continuity, as outlined by *H.J.*, 492 U.S. at 241–43 (noting that open-ended periods of racketeering may be shown by showing conduct which "projects into the future with a threat of repetition"). *See* Plaintiffs' Brief at 39–41. They argue that the they have sufficiently alleged a specific threat that the predicate acts of racketeering will continue. *Id.* In the Complaint, Plaintiffs allege that the RICO Defendants "are continuing to intimidate witnesses, send false statements through the mails, harass and terminate potential witnesses to the [Medicaid and tax fraud]." Compl. at ¶ 65; *see also id.* at ¶¶ 84(a) (alleging that mail and wire fraud "scheme," *i.e.*, to defraud board members "out of their votes," continues), 86(a) (alleging that racketeering activity "continues to the present, unabated"). Plaintiffs also allege that "committing the predicate acts ... has become the enterprises' [sic] regular way of treating employees and board members who are potential witnesses to the [Medicaid and tax fraud]." *Id.* at ¶ 84(d).

The RICO Defendants' response to the arguments that these factual allegations satisfy Rule 8's pleading standard is that the allegations of continuity lack sufficient factual bases. *See* Attorney Defendants' Brief at 20–23. However, under Rule 8's liberal pleading standard, and noting that I must assume the truth of the facts in the Complaint and must draw all reasonable infer-

ences from those facts in favor of the pleader, I cannot say that the allegations of continuing racketeering activity are insufficient.

Unlike the plaintiff in *Tarr v. Credit Suisse Asset Mgmt., Inc.*, 958 F.Supp. 785 (E.D.N.Y.1997), Plaintiffs here have made allegations that predicate acts of racketeering activity, *i.e.*, violations of 18 U.S.C. § 1512, are currently taking place, and they have made allegations that the enterprise regularly treats whistleblowers or those who are cooperating with investigations of the CARING Corporations in a way that constitutes harassment and intimidation. Furthermore, unlike the plaintiff in *Tarr*, *see id.* at 802, or the plaintiff in *Ponce Federal Bank*, 948 F.2d at 46, Plaintiffs have made allegations of racketeering activity which certainly has goals which do not end at a discrete moment in time, for example, activity such as the continued intimidation of those who would act as witnesses who provide information to the law enforcement agencies or other entities investigating the CARING Corporations. Such activity could, as Plaintiffs have alleged, continue beyond the discharge of Plaintiffs. *See, e.g.*, Compl. at ¶¶ 65, 84(a). Also, unlike the plaintiff in *Tarr*, Plaintiffs have made allegations that harassment, intimidation, and threatening witnesses have become the enterprise's regular way of doing business, for example, by alleging that the RICO Defendants have treated others, named and unnamed, beyond themselves, in a similar fashion. *See, e.g.*, Compl. at ¶¶ 65, 85(a), (d); *see generally* 2 Civil RICO Litigation § 9.05 [A][2][b][ii] at 9–31 to 9–32 (noting how courts have treated allegations of "regular way of doing business").

■ Finally, to the extent the harassment and intimidation are attempts to cover-up past criminal conduct, *i.e.*, the Medicaid and tax fraud, the racketeering activity con-

---

**25.** It is quite clear also that Plaintiffs do not adequately allege a closed-ended pattern with respect to the Attorney Defendants. To allege a cause of action under section 1961(c), every defendant must have committed acts constituting a pattern of racketeering behavior; allegations as to one defendant cannot necessarily be imputed to another defendant. *See Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir.1990); 1 *Civil RICO Litiga-*

*tion* § 4.03[E][2][a][i] at 4–87 & n. 223. Thus, Plaintiffs may not proceed on the closed-ended continuity theory against the Attorney Defendants. There does not, however, appear to be any reason why, as a theoretical matter, a plaintiff could not allege an open-ended pattern against some defendants and a closed-ended pattern against others.

stituting the cover-up by its nature presents a distinct threat of continuation in the long-term. Thus, insofar as it alleges open-ended continuity, the allegations, while somewhat conclusory, do satisfy the standard of pleading necessary to survive a 12(b)(6) motion to dismiss and Plaintiffs may proceed on this theory.

Accordingly, Defendants' motions to dismiss Count II alleging a violation of RICO, and Count IV alleging a violation of N.J. RICO, since the pattern requirement under the latter is similar to that under the former, *see generally State v. Ball,* 141 N.J. 142, 661 A.2d 251 (1995), *cert. denied,* 516 U.S. 1075, 116 S.Ct. 779, 133 L.Ed.2d 731 (1996); *see* Attorney Defendants' Brief at 25–26 (noting relationship between pattern requirement under RICO and N.J. RICO); CARING Defendants' Brief at 28–30 (same), will be denied.[26]

### 3. Conduct or Participation in the Conduct of the Enterprise

■ The Attorney Defendants have advanced the additional argument that Plaintiffs have not alleged that the Attorney Defendants "conduct[ed] or participat[ed], directly or indirectly, in the conduct of [the] enterprise's affairs," 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court interpreted this language to require that, in order to be liable under § 1962(c), "one must have some part in directing those affairs," *id.* at 179, that is to say, "one must participate in the operation or management of the enterprise

itself," *id.* at 185. In applying this test, the Third Circuit has held that mere provision of services which benefit an enterprise is not sufficient to create liability under RICO, *see University of Maryland v. Peat, Marwick, Main. & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993) (requiring that "there ... be a nexus between the person and the conduct in the affairs of an enterprise"), a proposition which has been applied on numerous occasions to the activities of lawyers within an alleged enterprise, *see, e.g., Madanes v. Madanes,* 981 F.Supp., 241, 256–57 (S.D.N.Y.1997) (noting that provision of important or essential services is not the same as "directing the affairs of an enterprise"); *see also Morin v. Trupin,* 832 F.Supp. 93, 98 (S.D.N.Y.1993) (noting the .even "substantial. persuasive power to induce management to take certain actions" does not fall within "operation or management" test).

■ Therefore, I must determine whether Plaintiffs' Complaint alleges more than the provision of legal services or the exercise of persuasive power by the Attorney Defendants, and, instead, whether the Complaint alleges participation in the operation or management of the enterprise. *See id.* at 1539 (rejecting argument that *Reves* test applies only on motion for summary judgment). The Complaint first alleges a number of actions taken by the Attorney Defendants which appear to be little more than the provision of legal services, activities which clearly do not satisfy the *Reves* test. *See, e.g.,* Compl. at ¶ 47 (noting that Attorney Defendants were "enlisted ... in Ann [Underland] and [the

26. Because Plaintiffs appear to rely primarily on the alleged violations of 18 U.S.C. § 1512 as the predicate acts which continue and threaten to continue, the Court need not decide whether the fraud alleged in the Complaint, *see* Compl. at ¶ 65, has been alleged with particularity under Rule 9(b). *See, e.g., Midwest Grinding Co.,* 976 F.2d at 1020 (discussing requirements that complaint alleging fraud must "at a minimum, describe the predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetrating the fraud' ").

It should also be noted that Plaintiffs will be required as part of this Court's case management procedures to supplement the factual allegations contained in the Complaint in a RICO Case

Statement. *See* Local Civil Rule 16.1(b)(4) & Appendix O to the Local Civil Rules. The RICO Case Statement is not merely an exercise in reorganizing the Complaint. Rather, it will require that Plaintiffs "state in detail and with specificity" many of the aspects of their RICO claim which have been alleged in somewhat conclusory, poorly delineated, and indeed "kitchen sink" fashions in the Complaint. The RICO Case Statement is considered a pleading and therefore, falls within the scope of Rule 11. *See id.* Of course, after the pleadings in this case are closed, Defendants may move for judgment on the pleadings pursuant to Rule 12(c) or move for summary judgment under Rule 56, for example, on the issue of whether the Attorney Defendants "seized power" over their clients.

other CARING Individual Defendants'] scheme to retaliate against, harass, and intimidate Plaintiffs"); *see also id.* at 48.

The Complaint then alleges "based on information, belief, and inferences from observations"[27] that the Attorney Defendants "conspired and acted with the other Defendants and/or orchestrated and designed the acts taken against Plaintiffs with the goal of intimidating Plaintiffs and other witnesses; obstructing justice; facilitating the other Defendants in their efforts to continue the commission of the acts which constituted the [Medicaid and tax fraud]; and fabricating a false defense for Ann [Underland]." *Id.* at ¶ 52. While closer to meeting the *Reves* test, these allegations do not allege participation in the operation and management of the enterprise since "participation requires some part in *directing* the affairs of the enterprise itself." *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F.Supp. 248, 254–255 (S.D.N.Y.1997) (emphasis added); *Biofeedtrac v. Kolinor Optical Enterprises & Consultants S.R.L.,* 832 F.Supp. 585, 591 (E.D.N.Y.1993) (noting that *Reves* rejects view that outside professionals, by going beyond customary role, will be deemed to have participated in operation and management of enterprise); *Morin,* 832 F.Supp. at 98 (noting that "substantial persuasive power to induce management to take certain actions" does not meet *Reves* test) (quoting *Strong & Fisher Ltd. v. Maxima, Leather Inc.,* 1993 WL 277205 (S.D.N.Y. July 22, 1993)); *Chamarac Properties, Inc. v. Pike,* 1993 WL 427137, *3 (S.D.N.Y. Oct.19, 1993) (Wood, J.) (discussing extent of outside accounting firm's involvement in wrongdoing found by jury in *Reves* in light of subsequent holding that accounting firm did not participate in operation or management of enterprise's affairs). There is no suggestion in the allegation described above that Meklinsky and

Fox, Rothschild had any power to direct their clients to take certain actions.

Plaintiffs come closest to meeting the *Reves* test when they allege:

Based on information, belief and inferences from observations, [the Attorney Defendants], as part of their conspiracy with Ann [Underland] and the [other CARING Individual Defendants], and with their assistance using [CARING] seized power and the control of the other CARING Corporate Defendants for the purpose of dissuading Plaintiffs from coming forth as witnesses, and they designed a campaign against Plaintiffs that had as its components the intimidation, punishment, defaming and maligning of, as well as retaliation against Plaintiffs and the fraudulent misrepresentation to those members of the boards not named as Defendants that (a) their loyalty was to the Boards and not to Ann (Underland); (b) Plaintiffs were the enemies of the CARING Corporate Defendants and could not be trusted; and (c) Plaintiffs were attempting to engage in extortion.

Compl. at ¶ 53. This allegation, even if somewhat conclusory, satisfies the *Reves* test since it alleges that the Attorney Defendants had the power to direct their clients to take certain actions, and further alleges behavior which is more than the provision of legal services. Therefore, the Attorney Defendants' motion to dismiss the RICO claim will be denied.[28]

## C. Common Law Causes of Action (Count V)

▇ Count V of the Complaint, asserted against all Defendants, alleges that Defendants' behavior was "tortious, intentional, wanton, outrageous, without valid privilege, negligent, and designed to injure and defame

---

**27.** The curious phrase "based on information, belief, and inferences from observations" cannot vary or lower the standard of reasonable inquiry established in Rule 11, and will not insulate an attorney from the imposition of Rule 11 sanctions, if proven and appropriate.

**28.** Finally, no Defendant has raised any issue regarding the sufficiency of Plaintiffs' allegations regarding the enterprise alleged by Plaintiffs.

*See, e.g., Lorenz v. CSX Corp.,* 1 F.3d 1406 (3d Cir.1993) (discussing requirement that, for section 1962(c), violation defendant and enterprise must be distinct); *Haroco v. American Nat'l Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir. 1984), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *see generally* 2 *Civil RICO Litigation* § 6.03; Rakoff & Goldstein, *RICO* § 1.05[7].

Plaintiffs." Compl. at ¶ 105; *see also id.* at p. 4 (noting that action asserts claims under "common law theories of conspiracy, interference with contract rights, defamation, and breach of contract"). The damages alleged are for "loss of earnings, loss of reputations, damages to their reputations, humiliation, pain, suffering, emotional distress and other compensatory and foreseeable consequential damages in an amount in excess of $75,000," plus punitive damages. *Id.* at ¶¶ 106–07.

Under Rule 8, this pleading is unclear and provides insufficient notice to Defendants of what the claim for relief is and how to frame a response in the form of an answer under Rule 8(b). While the standard set by Rule 8 is liberal, *i.e.*, all the Rule requires is "a short and plain statement of the claim showing that the pleader is entitled to relief," the statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47. While outlining a precise legal theory is not necessary to meet Rule 8's standards, *see, e.g., Crull v. GEM Ins. Co.*, 58 F.3d 1386, 1391 (9th Cir.1995), a pleading must nonetheless "give the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1215 at 137–39 (2d ed.1990); *see also* 5A *id.* § 1377 at 610 (discussing motion for more definite statement under Rule 12(e) in "judicially disfavored actions such as libel and slander"). Count V will therefore be dismissed without prejudice to Plaintiffs' right to amend their Complaint within twenty days to clarify the causes of action alleged consistent with the pleading standards described above.[29] Therefore, the Court need not consider the alternate grounds for dismissal asserted by Defendants, including the issue of whether the "litigation privilege" protects the Attorney Defendants from liability for, *inter alia*, defamation.

## IV. Conclusion

For the reasons set forth above, Count I of the Complaint will be dismissed with prejudice as to Defendants, Fox, Rothschild, Meklinsky, Carlisle Underland, Green, Field, and Haynie. The motions to dismiss will be denied as to Counts II (RICO) and IV (New Jersey RICO). Count V (the common law claims) will be dismissed without prejudice to Plaintiffs' right to amend their Complaint within twenty days of the date of this Opinion to clarify the common law causes of action which they seek to assert.

Plaintiffs' brief contains several *ad hominem* attacks on Defendants which I decline to repeat here, some of which I have noted above, *see* n. 14, *supra*. While I recognize and indeed, encourage the professional duty of counsel to represent their clients with zeal and vigor, I take this opportunity to remind counsel of their obligations under Rule 11 of the Federal Rules of Civil Procedure, and of their duties to this Court. At the end of the day, when discovery is complete and this case proceeds to trial, I am confident that the "facts," unadorned by such vitriolic hyperbole, will speak for themselves. In the law, as in architecture, "less" is frequently "more." Moreover, in this Court, counsel should be comforted by the fact that civility and professional courtesy will not be mistaken for weakness.

---

**29.** The parties both agree that New Jersey law provides for and defines the causes of action which appear to be at issue. Some of the parties also appear to agree, however, although incorrectly, *see e.g.*, Plaintiffs' Brief at 54; CARING Defendants' Brief at 35–36; Attorney Defendants' Reply Brief at 22–25 (Aug. 8, 1997), that, at least for the defamation claim, New Jersey law governs the *pleading* standard. It does not. *See RTC Mortgage Trust 1994 N–1 v. Fidelity Nat'l Title Ins. Co.*, 981 F.Supp. 334 (D.N.J.1997); *see, e.g., Mansmann v. Tuman,* 970 F.Supp. 389, 398 (E.D.Pa.1997); *Manns v. Leather Shop, Inc.*, 960 F.Supp. 925, 928 (D.V.I.1997); *Nanavati v. Burdette Tomlin Mem. Hosp.*, 857 F.2d 96, 109 (3d Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989); *see also* 5 *Federal Practice and Procedure* § 1245 at 309–10 (discussing federal pleading standard for similar tort actions).